MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2015 ME 46
Docket:        Yor-14-161
Argued:        February 10, 2015
Decided:       May 5, 2015

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

STATE OF MAINE

v.

THOMAS BENNETT

SAUFLEY, C.J.

[¶1]  Thomas Bennett, an employee of Saco Pawn and Loan, purchased what he knew to be stolen property for resale at the pawnshop.  He did not disclose the purchase when the rightful owner, the victim of a recent burglary, told Bennett that he had been recently robbed and that he was trying to locate his stolen property. Bennett then lied to a detective with the Saco Police Department when he was asked whether he had purchased any of the victim's stolen property.  After a jury found Bennett guilty of theft by receiving stolen property (Class D), 17-A M.R.S. § 359(1)(B)(5) (2014), the Superior Court (York County, *Fritzsche, J.*) sentenced Bennett to fourteen days in jail and a $500 fine, plus applicable surcharges.

[¶2]  Bennett directly appeals from his sentence.  He argues that the sentence imposed by the court is illegal because it is disproportionate to the crime

2

committed and in violation of his equal protection and due process rights. We affirm the sentence.

## I. BACKGROUND

[¶3] "Viewed in the light most favorable to the jury's verdict, the record supports the following facts." *State v. Ormsby*, 2013 ME 88, ¶ 2, 81 A.3d 336. On April 26, 2013, the victim's home was burglarized, and the victim reported that, among other items, comic books, electronics, and a Penn Senator fishing reel were stolen. After the burglary, a Saco police officer interviewed the victim and filed a report about the incident. The victim valued the fishing reel at approximately $700.

[¶4] The next day, the victim began driving to local pawnshops looking for his stolen items. One of these pawnshops was Saco Pawn and Loan, where Bennett was employed. The victim told Bennett that he had been robbed and was searching for his missing items, specifically mentioning his fishing reel and electronics. Bennett did not tell the victim that the fishing reel was at the pawnshop.

[¶5] A detective from the Saco Police Department investigated the burglary. As part of his investigation, on or about April 29, 2013, he spoke with Bennett regarding the missing fishing reel. The detective was familiar with Bennett because he oversees the pawnshops in the Saco area. That oversight includes

checking for compliance with existing regulations and monitoring the property that is purchased and then sold from pawnshops. Bennett told the detective that an individual named Arthur McCurry had come into the pawnshop looking to sell comic books, electronics, and a couple of fishing reels. Bennett alleged that he had previously purchased property from McCurry that he believed had been stolen. Bennett explicitly told the detective that he did not purchase any items from McCurry.

[¶6] Thereafter, the detective interviewed McCurry about the burglary and obtained and executed a search warrant for Saco Pawn and Loan. While executing the warrant, a police officer located a Penn Senator fishing reel wrapped in a yellow cloth bag in a wooden cabinet behind the counter. The item was photographed and taken to the Saco Police Department, where the victim identified both the cloth bag and the fishing reel as his own. Officers executing the search warrant also checked the daily logs of purchases and sales for the business to determine whether any fishing reel was listed. During the time in question, there was no record of any transaction regarding a fishing reel.[1]

[¶7] After the fishing reel was found, Bennett asked to speak with one of the detectives outside, where he admitted that he had purchased the reel from

---

[1] Pawnshops are required to keep records of the items that come into their possession and to file those records with law enforcement. *See* 30-A M.R.S. § 3962 (2014).

4

McCurry. He explained that he had been hoping McCurry would bring in more of the victim's stolen items so that he could purchase them from McCurry "in hopes of getting it all," and then have the victim pay him back for the stolen property. Bennett further explained that he did not tell anyone this because he did not want to scare McCurry off from bringing in more stolen property. The detective specifically asked Bennett if he had purchased the fishing reel before the victim had come into the shop to look for his stolen property. Bennett admitted that he had, and admitted that he did not tell the victim that he had recovered his fishing reel.

[¶8] Bennett was indicted for theft by receiving stolen property (Class C), 17-A M.R.S. § 359(1)(B)(4) (2014). A jury trial was held on March 18, 2014, at which Bennett testified in his own defense. At the conclusion of the one-day trial, the jury acquitted Bennett of Class C theft by receiving stolen property, 17-A M.R.S. § 359(1)(B)(4), but convicted him of the lesser included offense of Class D theft by receiving stolen property, 17-A M.R.S. § 359(1)(B)(5).[2]

[¶9] After the entry of the jury's verdict, the court asked whether Bennett would like to proceed directly to sentencing or instead address sentencing at

---

[2]  Title 17-A M.R.S. § 359(1)(B)(4) (2014) involves property valued at "more than $1,000 but not more than $10,000," while 17-A M.R.S. § 359(1)(B)(5) (2014) involves property valued at "more than $500 but not more than $1,000." There was conflicting testimony at trial through the State's and Bennett's experts regarding the value of the stolen fishing reel.

another time in the future. Bennett indicated that he would prefer to proceed directly to sentencing. The State requested a $700 fine based in part on the wishes of the victim that Bennett not be convicted of a felony or incarcerated. Bennett requested a $350 fine. Before sentencing Bennett, the judge asked whether Bennett had anything that he wanted to say. Bennett then told the judge that he was raising his nine-year-old grandson and was primarily responsible for the child's care and daily routine.

[¶10] Before sentencing him, the court spoke directly to Bennett, stating:

One of the things that was troublesome to me about just the facts of this case was that while the State initially had a value that the evidence didn't fully support, they did have the basic fact that it was receiving stolen property. The evidence was absolutely overwhelming.

It seemed that Mr. McCurry was known to you to be a thief, that it suggested that he had stolen from his father. You had every reason to believe that that fishing reel was hot. There's no reason Arthur McCurry would have ever had one of those legitimately.

. . .

You—it's not a question of believing it was probably stolen. I don't think you had any doubt at all but that it was stolen. You had the opportunity to let [the victim] know . . . you had the opportunity to let the police know. It seemed that you were concerned about being out your $80 if they took it back from you.

I've been looking at burglary and theft and bad check and robbery cases, particularly the burglary and theft charges. And it's absolutely clear that for all the United States, including Maine, including [York] [C]ounty, there's a profound problem with, particularly younger

people, and some older people, misusing a variety of drugs. Many of them are still quite expensive. Some of the ones that are cheaper are even more dangerous.

So for most of the people, they have no legitimate way of making the kind of money they need to support their addiction, so they steal things. And they don't want fishing reels, they don't want gold coins, they don't want jewelry, they want cash. And your business and a number of others routinely take stolen items.

Much of your merchandise is legitimate. You're a lawful business, but a significant portion of what pawnshops take in is stolen, it's known to be stolen. I'm absolutely, positively convinced of that. As a general proposition, that there's a significant—that existence of the pawnshop is kind of the third part of the trinity of burglars and drug dealers. And they're all –

And so, normally, but for your child, I would probably give you somewhere between 30 and 60 days in jail. To make a statement of what you did was inexcusable and to have other pawnshop owners pay attention to this. Because of your child, I'm going to cut it back . . . .

Instead of sentencing Bennett to the thirty to sixty days in jail originally considered by the court, the court sentenced Bennett to fourteen days in jail and a $500 fine, plus surcharges. Bennett did not object to the court's statements at sentencing or move for correction or reduction of his sentence. *See* M.R. Crim. P. 35. Because of the brevity of Bennett's sentence, he is ineligible to file an application for leave to appeal his sentence with the Sentence Review Panel of the Supreme Judicial Court. *See* 15 M.R.S. §§ 2151, 2152 (2014); M.R. App. P. 20(a)(1). Instead, Bennett appealed his sentence to us and was granted a stay of execution pending

the outcome of this appeal.[3] *See* 15 M.R.S. § 2115 (2014); M.R. App. P. 2; *State v. Mosher*, 2012 ME 133, ¶ 4, 58 A.3d 1070.

## II. DISCUSSION

A.     Standing to Appeal Sentence

[¶11]   As an initial matter, we note that a direct appeal from a sentence is only justiciable upon a claim "that the sentence is illegal, imposed in an illegal manner, or beyond the jurisdiction of the court, and the illegality appears plainly in the record." *State v. Schmidt*, 2010 ME 8, ¶ 5, 988 A.2d 975.  Any claimed abuse of discretion in the court's application of the Hewey process can be reviewed only upon the grant of an application for "leave to appeal from sentence," which is not available to Bennett in this case.  15 M.R.S. § 2152; *see id.* § 2151; 17-A M.R.S. § 1252-C (2014); *State v. Ricker*, 2001 ME 76, ¶ 18, 770 A.2d 1021.

[¶12]   There are no statutory infirmities in the sentence before us.  The court had jurisdiction to sentence Bennett, *see* 15 M.R.S. § 1 (2014), and Bennett's jail sentence falls well within the timeframe explicitly authorized by the Legislature for a person convicted of a Class D crime, *see* 17-A M.R.S. § 1252(2)(D) (2014) (authorizing a court to impose a term of imprisonment of less than one year).  No aspect of the sentence, including the commitment to jail, the fine, or the

---

[3]   Bennett has also filed a petition for post-conviction review, which has been stayed pending the outcome of this appeal.  The court denied Bennett's motion for stay of execution of his sentence until after the resolution of his post-conviction review.

surcharges, falls outside of the court's authority. *See id.*; 17-A M.R.S. § 1301(1-A)(D) (2014); 4 M.R.S. § 1057 (2014).

[¶13] Thus, the record discloses no obvious illegality that can be addressed through this direct appeal. Nonetheless, Bennett argues that the sentence is illegal because (1) it constitutes an unconstitutionally disproportionate sentence in violation of the Eighth Amendment to the United States Constitution and article 1, section 9 of the Maine Constitution; (2) he was punished based on his profession, not on the crime he committed, in violation of his equal protection rights; and (3) his sentence was "enhanced" without sufficient factual support, in violation of his due process rights. Claims alleging violations of a defendant's constitutional rights constitute an attack on the legality of the sentencing proceeding and may be cognizable on direct appeal. *See Ricker*, 2001 ME 76, ¶ 19, 770 A.2d 1021.

B.    Constitutional Claims

[¶14] We review the legality and constitutionality of a sentence de novo. *State v. Harrell*, 2012 ME 82, ¶ 4, 45 A.3d 732; *see State v. Brockelbank,* 2011 ME 118, ¶ 15, 33 A.3d 925; *State v. Cain*, 2006 ME 1, ¶ 7, 888 A.2d 276. "On direct appeal, we are limited to reviewing only the legality, and not the propriety, of sentences imposed by the trial court." *State v. Briggs*, 2003 ME 137, ¶ 4, 837 A.2d 113; *see State v. Mahan*, 1998 ME 143, ¶ 1 n.3, 711 A.2d 1314.

1. Eighth Amendment

[¶15] We first address Bennett's Eighth Amendment claim. The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Article 1, section 9 of the Maine Constitution explicitly provides that "all penalties and punishments shall be proportioned to the offense." Me. Const. art. I, § 9. "[O]nly the most extreme punishment decided upon by the Legislature as appropriate for an offense could so offend or shock the collective conscience of the people of Maine as to be unconstitutionally disproportionate, or cruel and unusual." *State v. Ward*, 2011 ME 74, ¶ 18, 21 A.3d 1033 (alterations omitted) (quotation marks omitted). Bennett was sentenced to two weeks in the county jail and a $500 fine after a jury convicted him of theft by receiving stolen property. His sentence falls within the lower range of the lowest quadrant of the incarceration time authorized by the Legislature for a Class D crime. Therefore, as to Bennett's Eighth Amendment claim, no illegality appears plainly in the record, *see Ricker*, 2001 ME 76, ¶ 18, 770 A.2d 1021, and his direct appeal as to that claim fails.

2. Equal Protection

[¶16] Bennett contends that the sentence imposed violates his right to equal protection pursuant to the Maine and United States Constitutions because the court

enhanced his sentence solely because he was a pawnshop employee, thus discriminating against him with no rational basis for such discrimination.

[¶17] The Maine Constitution guarantees that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws." Me Const. art. 1, § 6-A. This provision is coextensive with the Fourteenth Amendment to the United States Constitution. *Mosher*, 2012 ME 133, ¶ 11, 58 A.3d 1070. To determine whether there is a violation of the equal protection clause we apply a two-step analysis. *State v. Poole*, 2012 ME 92, ¶ 8, 46 A.3d 1129. First, as a threshold requirement, the party challenging the constitutionality has the burden to "show that similarly situated persons are not treated equally under the law." *Id.* (quotation marks omitted). Absent this threshold showing, an equal protection claim is not viable. *See id.* Only where this threshold requirement is met do we move on to the second step of determining what level of scrutiny to apply.[4] *Id.*

[¶18] Bennett has failed to demonstrate that the court treated "arguably indistinguishable" classes of people differently. *Ross v. Moffitt*, 417 U.S. 600, 609

---

[4] Rational basis scrutiny is applied when, as here, the challenged discrimination does not involve a fundamental right or suspect class. *See Anderson v. Town of Durham*, 2006 ME 39, ¶ 29, 895 A.2d 944. "Under the rational basis standard, the burden is on the party challenging the government action to demonstrate that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." *Id.* (quotation marks omitted).

(1974). To the extent that Bennett argues that, as a pawnshop employee, he was treated dissimilarly from all other employees, the defined classes of pawnshop employees and nonpawnshop employees are not similarly situated. *See, e.g., Carter v. Arkansas*, 392 F.3d 965, 968-69 (8th Cir. 2004) (holding that public school employees are not similarly situated with other state employees); *Arnold v. City of Columbia, Mo.*, 197 F.3d 1217, 1220-21 (8th Cir. 1999) (holding that city police officers are not similarly situated with other city employees); *Clark v. United States*, 691 F.2d 837, 841-42 (7th Cir. 1982) (stating that pensioners with state and private pension plans are not similarly situated with federal pensioners). To the extent that Bennett argues that he was treated dissimilarly to other pawnshop employees who engaged in similar criminal conduct, i.e., similarly situated individuals, our review of the record leads us to the opposite conclusion. The court explicitly addressed the need to deter all pawnshop employees from treating complicity in a theft as an acceptable business decision, and Bennett has failed to demonstrate that the court would have treated another pawnshop employee engaged in this sort of criminal conduct any differently.

[¶19] Although the exact formula for determining whether individuals are similarly situated is not always easy to discern, *see, e.g., Coyne v. City of Somerville*, 972 F.2d 440, 444-45 (1st Cir. 1992), Bennett has failed to demonstrate

12

the required showing here. Thus, his equal protection claim fails on this basis alone.

[¶20] Even if we were to conclude that Bennett had surpassed the threshold requirement of proving that similarly situated individuals are not treated equally, the challenged judicial classification is rationally related to a legitimate state interest. The State has an undeniably strong interest in deterring pawnshops, and by extension pawnshop employees, from engaging in negotiations to buy and sell items that are known or believed to be stolen. Preventing further crime through the deterrent effect of sentences is a legitimate criminological goal. *See* 17-A M.R.S. § 1151(1) (2014). Moreover, pawnshop employees are more likely than employees in other types of employment to have opportunities to receive stolen property. Indeed, the Legislature has enacted specific provisions related to these concerns by requiring pawnshop employees to keep detailed records of purchase and sales transactions. *See* 30-A M.R.S. § 3962 (2014). Thus, any judicial classification applied to pawnshop employees is neither irrational nor arbitrary. *See State v. Chapin*, 610 A.2d 259, 261 (Me. 1992).

3. Due Process

[¶21] Finally, Bennett argues that his sentence violates his right to due process because it is based on factually unreliable information, and he was not

given an opportunity to refute the information relied on at sentencing. We disagree.

[¶22] The United States and Maine Constitutions guarantee that "[n]o person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V; Me. Const. art. I, § 6-A. A court "is accorded wide discretion in the sources and types of information that may be relied upon" at sentencing, *State v. Farnham*, 479 A.2d 887, 890 (Me. 1984), and "is not limited to facts found at trial," *State v. Gallant*, 600 A.2d 830, 832 (Me. 1991). "[T]hey are limited only by the due process requirement that such information must be 'factually reliable and relevant.'" *State v. Grindle*, 2008 ME 38, ¶ 18, 942 A.2d 673 (quoting *State v. Hewey*, 622 A.2d 1151, 1154 (Me. 1993)).

[¶23] Federal cases have interpreted the due process clause as requiring a defendant "not to be sentenced on false information . . . [and] requir[ing] that the defendant be given an adequate opportunity to refute information relied on at sentencing." *United States v. Wilfred Am. Edu. Corp.*, 953 F.2d 717, 722 (1st Cir. 1992) (citation omitted). The Federal Constitution does not, however, "restrict[] the view of the sentencing judge to the information received in open court." *Williams v. New York*, 337 U.S. 241, 251 (1949).[5]

---

[5] Unlike the present case, many of the cases discussing a court's duty under due process to ensure the factual reliability of evidence it considers at sentencing involve hearsay statements or evidence of additional unlawful, uncharged conduct of the defendant that was not presented at trial. *See, e.g., United*

14

[¶24] Here, at sentencing, the court did not consider unreliable information such as unreliable hearsay or information alleging attenuated additional uncharged conduct of Bennett. The court stated,

> Much of your merchandise is legitimate. You're a lawful business, but a significant portion of what pawnshops take in is stolen, it's known to be stolen. I'm absolutely, positively convinced of that. As a general proposition, that there's a significant—that existence of the pawnshop is kind of the third part of the trinity of burglars and drug dealers.

[¶25] These statements do not demonstrate a constitutional infirmity. The evidence at trial overwhelmingly established that Bennett received what he knew to be stolen property, that he failed to record the transaction as required by law, and that, by his own admission, he intended to buy more of the victim's stolen property from McCurry so that he could sell it back to its rightful owner. Moreover, Bennett admitted that he had previously purchased property from McCurry that he believed had been stolen. There is a rational connection between Bennett's testimony and the court's assertion that some property that "pawnshops

---

*States v. Wilfred Am. Edu. Corp.*, 953 F.2d 717, 722 (1st Cir. 1992) (holding that the court permissibly relied on an affidavit alleging additional criminal conduct that was provided to the court and the defendant the evening before the sentencing hearing); *State v. Soucy*, 2006 ME 8, ¶ 16, 890 A.2d 719 ("[A] court may consider uncharged conduct [of the defendant] . . . and the court has discretion to determine the process for ensuring that the information is reliable."); *State v. Whitten*, 667 A.2d 849, 852 (Me. 1995) (holding that the court abused its discretion by considering a letter that alleged additional criminal conduct of the defendant without taking any steps to ensure its reliability); *State v. Fleming*, 644 A.2d 1034, 1036 (Me. 1994) (holding that the court did not violate the defendant's right to due process by considering the victim's family's statements or a letter from the victim's doctor to determine the impact of the defendant's conduct on the victim); *State v. Dumont*, 507 A.2d 164, 167-68 (Me. 1986) (holding that the court was allowed to consider affidavits at sentencing asserting that the defendant had engaged in similar unlawful conduct on other occasions).

take in is stolen, it's known to be stolen. I'm absolutely positively convinced of that."

[¶26]  The court's reference to drug-seeking behavior and the connection to burglaries does not change the analysis.  It is not improper for judges, who are confronted daily with the many consequences of drug addiction, including charges of theft, burglary, and other drug-related crimes, to use their own knowledge and experience when considering an appropriate sentence.  *See Barclay v. Florida*, 463 U.S. 939, 950 (1983) ("It is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences. . . .  It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing."); *Stedtfeld v. State*, 755 P.2d 1311, 1315 (Idaho Ct. App. 1988) ("[T]rial judges are vested with sentencing discretion so that they can apply their own judgment and experience to the task of independently sentencing each defendant that comes before them.").  The sentencing justice carefully articulated that the reasoning for Bennett's sentence was rooted in deterring this type of behavior.  The justice noted that pawnshops—businesses that supply quick cash in exchange for goods—are ripe for playing a part in the pursuit of access to drugs.  The Legislature has enacted specific provisions related to these concerns.  *See* 30-A M.R.S. § 3962.  When read in context, the sentencing justice's statements were made to reinforce the deterrent

16

effects of sentencing and to remind Bennett and other pawnshop owners or employees that their role in receiving potentially stolen property is not isolated, that the perpetuation of this behavior has far-reaching consequences, and that courts take this crime seriously.

[¶27]  The court's understanding of the relationship between drug addiction and the unlawful taking of property to be sold at pawnshops is not the type of factually unreliable information that we have determined deprives a defendant of his right to due process. *See State v. Whitten*, 667 A.2d 849, 851-53 (Me. 1995). The connection is further demonstrated by the Legislature's careful attention to the need for pawnshops to keep records of the items that come into their possession and to file those records with law enforcement on a monthly basis. *See* 30-A M.R.S. § 3962.

[¶28]  Finally, the court did not unconstitutionally deprive Bennett of his opportunity to refute the information relied on at sentencing.  The court gave Bennett the opportunity to postpone sentencing until a later date so that he could prepare a sentencing argument.  When Bennett indicated that he wanted to proceed immediately to sentencing, after listening to the sentencing recommendations of both parties, the court explicitly provided him with the opportunity "to tell [the court] anything he'd like [the court] to know about himself or the offense or anything he'd like to say."  Bennett neither objected to the court's statements after

they were made, nor moved for correction or reduction of his sentence pursuant to

M.R. Crim. P. 35.  The sentencing proceeding was constitutionally sound.

The entry is:

Sentence affirmed.

---

**On the briefs:**

Molly Butler Bailey, Esq., Strike, Goodwin & O'Brien, Portland, for appellant Thomas Bennett

Kathryn Loftus Slattery, District Attorney, and Anne Marie Pazar, Esq., Prosecutorial District # 1, Alfred, for appellee State of Maine

**At oral argument:**

Molly Butler Bailey, Esq., for appellant Thomas Bennett

Anne Marie Pazar, Esq., for appellee State of Maine

York County Superior Court docket number CR-2013-1448
FOR CLERK REFERENCE ONLY