MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2024 ME 24
Docket:      SRP-22-293
Argued       June 8, 2023
Decided:     April 9, 2024

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.*

STATE OF MAINE

v.

TARA L. WATSON

DOUGLAS, J.

[¶1]  Tara L. Watson seeks review of a three-year prison sentence imposed by the trial court (Somerset County, *Benson, J.*) after Watson pleaded guilty to unlawful possession of scheduled drugs (cocaine base) (Class C), 17-A M.R.S. § 1107-A(1)(B)(3) (2023).[1]  Watson's principal contention on appeal is that the court, in deciding whether to suspend her sentence and establish a period of probation, abused its discretion by disregarding or misapplying sentencing principles.  We vacate the sentence and remand for the court to resentence Watson.

---

* Although Justice Jabar participated in this appeal, he retired before this opinion was certified.

[1] Watson also pleaded guilty to two misdemeanors, but the issues raised in this sentence appeal pertain only to the sentence for felony possession.  *See* 15 M.R.S. § 2151 (2023) (providing that only sentences of imprisonment of one year or more are subject to review by the Supreme Judicial Court).

## I. BACKGROUND

[¶2]  On July 14, 2022, Tara L. Watson was charged by indictment with three crimes alleged to have been committed on or about May 11, 2022:

- Unlawful possession of scheduled drugs (cocaine base) (Class C), 17-A M.R.S. § 1107-A(1)(B)(3);[2]

- Refusing to submit to arrest (Class E), 17-A M.R.S. § 751-B(1)(A) (2023); and

- Violation of condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2023).[3]

The trial court accepted Watson's guilty plea to all three charges on August 8, 2022.

[¶3]  On August 17, 2022, the court held a sentencing hearing.  The leading charge for sentencing purposes was Count 1, unlawful possession of cocaine base, a Class C crime punishable by up to five years in prison.  *See* 17-A M.R.S. § 1604(1)(C) (2023).

[¶4]  The State began by summarizing the facts underlying the unlawful-possession charge and Watson's criminal history.  Watson and a

---

[2]  The unlawful-possession charge in Count 1 was elevated to a Class C felony because the amount of cocaine base (a schedule W drug) that Watson possessed was three grams—above the statutory two-gram limit for the elevation as specified in 17-A M.R.S. § 1107-A(1)(B)(3) (2023); *see* 17-A M.R.S. § 1102(1)(F) (2023).  Possession of two grams or less is a Class D misdemeanor offense.  *Id.* §§ 1102(1)(F), 1107-A(1)(C).

[3]  Before the indictment, Watson had been charged with the crimes in a criminal complaint filed on May 13, 2022.

co-defendant were in a vehicle in which three grams of cocaine were found under the driver's seat, where the co-defendant was sitting, and drug paraphernalia was found in the passenger seat, where Watson was sitting. Watson gave a false name to the officer and ran after getting out of the vehicle.

[¶5]  Watson's criminal history included four bail violations from 2018 and 2019, resulting in sentences ranging from seven to sixty days; a conviction of possession of cocaine base, resulting in an eighteen-month sentence served after a failed deferred disposition; and 2021 convictions of refusing to submit to arrest and escape, resulting in twenty-four-hour sentences.  At the time of the sentencing on the charges at issue in this appeal, Watson was facing additional misdemeanor charges in Somerset County of violating conditions of release and unlawful possession of scheduled drugs.[4]

[¶6]  On July 11, 2022, less than one month before the sentencing hearing in this case, Watson pleaded guilty to unlawful trafficking in scheduled drugs (Class B), 17-A M.R.S. § 1103(1-A)(A) (2023), in an unrelated case pending in another county, and was sentenced by the court (York County, *Moskowitz, J.*) to

---

[4]  We take judicial notice of the docket records in those cases.  *See Gardner v. Greenlaw*, 2022 ME 53, ¶ 3 n.1, 284 A.3d 93.

4

three years of incarceration with all but twenty-one days suspended and two years of probation.[5]

[¶7]  In this case, the State argued that Watson was not a good candidate for probation because of her history of possession and use, her previous violation of conditions of release, and—with respect to the pending charges— her delivery of a false name and flight from the officer who stopped the vehicle in which she was a passenger.  The State requested a sentence of three years, none suspended, for the possession charge, and a concurrently running six-month sentence on each of the other two charges, along with the mandatory minimum $400 fine.  *See* 17-A M.R.S. § 1126(2) (2023).

[¶8]  Pointing to a societal shift from punishment to treatment for offenders with acute substance use disorders, Watson argued for a probated sentence so that she could focus on addressing her substance use disorder for the first time in a highly supervised residential program.  Watson emphasized that she had no history of violence or driving under the influence and that most, if not all, of her prior convictions were related directly to her untreated addiction.  Although she had not been successful previously on bail and on a

---

[5]  The sentencing record does not provide any details about the underlying facts of the trafficking charge.

deferred disposition, she had never been on probation nor seriously addressed her substance use disorder in a structured, residential program. She had applied and been accepted to a such a program at the Esther House in Saco, where she would be regularly drug-tested and where she would be required to attend meetings, get a sponsor, arrange for counseling and treatment, secure employment, and follow house rules. A representative from the program appeared at the sentencing hearing, explained how the program works, and confirmed that Watson had been accepted.

[¶9] Watson proposed a sentence of three years, fully suspended, and two years of probation. She asked that the sentence run consecutively to the three-year, largely suspended sentence that she had received the previous month. She argued that a lengthy probation (consisting of consecutive probationary periods in her two cases) with the potential for up to six years of incarceration would provide a strong incentive for her to succeed at Esther House. She asked that the court sentence her to thirty days' incarceration for each of the misdemeanor counts and agreed that she would owe a $400 fine.

[¶10] The court asked Watson to explain how she proposed the court apply steps one and two of the requisite three-step sentencing analysis adopted in our decision in *State v. Hewey*, 622 A.2d 1151 (Me. 1993), and codified in

6

statute,[6] 17-A M.R.S. § 1602(1) (2023).  Watson argued for a three-year basic sentence (to be suspended in the third step of the analysis).[7]  The State argued for a basic sentence of two years based on the nature and seriousness of the offense as committed, with a maximum period of incarceration set at three years because of Watson's criminal history, and for no suspension of the sentence.

[¶11]  After allowing Watson to respond, the court began its sentencing analysis, stating as follows:

> Simply by way of introduction I would say that I agree with absolutely everything that [defense counsel] said in terms of his description of the shift in approach in drug cases over the last relatively recent period of time, particularly in connection with the current [L]egislature.  There has been, I think particularly in elite circles, a profound shift in the perception of drug use and the fact that some of these cases have not been decriminalized is something

---

[6] "When sentencing a person convicted of a felony in Maine, the sentencing court is bound by the analysis prescribed in *State v. Hewey*[, 622 A.2d 1151 (Me. 1993),] and codified at 17-A M.R.S. § 1602." *State v. Ringuette*, 2022 ME 61, ¶ 9, 288 A.3d 393.  The court first determines "a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the individual."  17-A M.R.S. § 1602(1)(A) (2023).  It then determines "the maximum term of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case."  *Id.* § 1602(1)(B).  Finally, the court determines "what portion, if any, of the maximum term of imprisonment . . . should be suspended and, if a suspension order is to be entered, determine[s] the appropriate period of probation or administrative release to accompany that suspension."  *Id.* § 1602(1)(C). At each step, the sentencing court must consider and articulate the goals that are served by the sentence, taking into account the general purposes of sentencing set forth in 17-A M.R.S. § 1501 (2023).  *See infra* ¶¶ 21-22.

[7] Watson's counsel stated, "[I]n terms of basic sentence, I think the State and I are somewhat in agreement with three years being sort of the number."  It is clear from the context that counsel was referring to the maximum sentence (step two), not the basic sentence (step one).

of a shock to me. So I recognize the shift that [defense counsel] is referring to.

The court continued by referencing its previous experience as a homicide prosecutor:

> I would say 70 to 80 percent of the [nondomestic homicide] cases that I prosecuted involved the use and abuse, regardless of whether—whatever the DSM IV or V now may say concerning drug use, concerned the abuse of substances. People situated like Ms. Watson who were desperate to get the next fix or were desperate to become involved in some sort of drug imbroglio, it seemed to be the inevitable background of every homicide that I dealt with, and there were probably on average 25 to 30 homicides in Maine over the course of the average year. And 70 to 80 percent of them involved these drugs.

> So I agree that I'm obliged to accept the law as it's given to me by the Maine [L]egislature and the Maine Supreme Judicial Court, but I guess based on my own experience, and I bring my life experience to my current role as a judicial officer, I sometimes question the wisdom of what appears to be the shift in elite opinion over the last few years. So I'll simply say that by way of introduction to my analysis.

[¶12]  Undertaking its sentencing analysis, the court observed that its task in step one of the *Hewey* analysis is to determine the basic sentence by "looking at all the ways in which the offense can be committed" and placing Watson's conduct "on that sort of mythical continuum, and deciding how serious it is on that mythical continuum." Because the court determined that the quantity of drugs that Watson possessed (one gram over the two-gram

8

minimum, making the offense a Class C felony) did not place her conduct among the most serious ways in which this offense could be committed, it set the basic sentence at two years. *See* 17-A M.R.S. § 1602(1)(A).

[¶13] In step two, which focuses on the mitigating and aggravating factors specific to the defendant, *see id.* § 1602(1)(B), the court found as a mitigating factor that Watson had accepted responsibility (though Watson had given a false name to law enforcement at the time the drugs were discovered) and as aggravating factors that Watson had multiple bail violations, had a failed deferred disposition, and, in this case, had refused to submit to arrest. The court determined that the aggravating factors outweighed the mitigating factors and set the maximum period of incarceration at three years.

[¶14] In step three, to determine what portion of the sentence, if any, should be suspended to arrive at the final sentence, *see id.* § 1602(1)(C), the court considered some of the purposes of sentencing set out in statute, beginning with the need to restrain individuals:[8]

> For reasons that I've already discussed in terms of the profound interconnection of drugs with homicides, at least in the Court's experience, I think the restraint of individuals is, in fact, in the interest of public safety, even though the prevailing elite consensus seems to be that we should treat drug addiction as a mental health

---

[8] The court did not find persuasive any of the sentences imposed on other defendants that Watson identified as potentially comparable, and Watson does not claim any error on this basis.

issue as opposed to a public safety issue. That simply is not consonant with the experience of the Court.

*See* 17-A M.R.S. § 1501(1) (2023). The court stated that it had to consider other general sentencing purposes set out in 17-A M.R.S. § 1501[9] as well and, after noting that restitution was not relevant, listed without further explanation minimizing correctional experiences, providing notice of sentences that may be imposed, encouraging the just individualization of sentences, and acknowledging the gravity of the offense. *See* 17-A M.R.S. § 1501(2)-(4), (6). The court did not mention or consider section 1501(5), which provides that one purpose of sentencing is to "[e]liminate inequalities in sentences that are unrelated to legitimate criminological goals." Although impressed "with the amount of work [defense counsel] ha[d] done in terms of trying to line up the Esther House for Ms. Watson," ultimately the court rejected probation as an alternative.

[¶15] Accordingly, on the unlawful-possession charge, Watson was sentenced to three years' incarceration, with no time suspended, and a $400

---

[9] Subsection 8(C) of 17-A M.R.S. § 1501 was amended, effective after the sentencing at issue here, in ways that are not material to this case. *See* P.L. 2023, ch. 430, § 2 (effective Oct. 25, 2023) (to be codified at 17-A M.R.S. § 1501(8)(C)). We quote the version that was in effect at the time of the sentencing.

10

fine.[10]  On each of the other two counts, the court sentenced Watson to six months in prison, to run concurrently with the three-year sentence on the possession count.  Watson raised no objection to the sentencing.

[¶16]  Watson timely applied for review of this sentence as well as the sentences entered with respect to the other Somerset County misdemeanors of which Watson was convicted at around the same time.  15 M.R.S. § 2151 (2023); M.R. App. P. 2B(b)(1), 20(b).  The Clerk of the Law Court dismissed the application for review of the sentences on the misdemeanors because those sentences did not include, and could not have included, a term of imprisonment of one year or more.[11]  *See* 15 M.R.S. § 2151; M.R. App. P. 12A(b)(3), 20(a)(1).  The Sentence Review Panel granted the application for review of the sentence on the unlawful-possession count.

## II.  DISCUSSION

[¶17]  Watson contends that her sentence should be vacated because the sentencing court erred in all three steps of the sentencing analysis.  We find no error with respect to the court's analysis in setting the basic and maximum

---

[10]  Her co-defendant, who had three prior misdemeanor convictions but no prior felony convictions, also pleaded guilty and received a sentence of two years, with all but sixteen months suspended and two years of probation.

[11]  Watson did not seek review of the Clerk's order.  *See* M.R. App. P. 12A(b).

sentences in steps one and two, respectively, and focus on its determination of the final sentence in step three.[12]  In that regard, Watson asserts that the imposition of an unsuspended, three-year prison sentence was not supported by the sentencing record but rather was improperly based upon the court's personal beliefs; was entered in disregard of relevant statutory sentencing purposes; and was "almost entirely punitive" in that it "deprive[d] [her] of the opportunity to avail herself of a rehabilitation program into which she had already been accepted."

## A.    Standard of Review

[¶18]  We review for an abuse of discretion a challenge to a court's determination of the final sentence at step three.  *State v. Reese,* 2010 ME 30, ¶ 23, 991 A.2d 806.  Because these issues were not raised to the sentencing

---

[12] Watson argues that the court erred in step one by "misappl[ying] legal principle, in not making more concrete findings, and musing that the basic sentence phase of the *Hewey* analysis was 'mythical.'"  Although the court did characterize its task in phase one as placing defendant's conduct in this case "on that sort of mythical continuum," the analysis it then used for determining the basic sentence was consistent with sentencing principles.  In the absence of an objection and given a record that supports a basic sentence of two years—a sentence that is shorter than the term Watson requested as a maximum sentence and significantly below the statutory limit of five years, *see* 17-A M.R.S. § 1604(1)(C) (2023)—the court did not commit obvious error in the first step of its sentencing analysis.  *See* 17-A M.R.S. § 1602(1)(A); *State v. Commeau*, 2004 ME 78, ¶ 19, 852 A.2d 70; *State v. Burdick*, 2001 ME 143, ¶ 13, 782 A.2d 319.  Nor did the court commit obvious error in its balancing of aggravating and mitigating factors to establish a three-year maximum period of incarceration at step two of the *Hewey* analysis given that Watson had agreed that a three-year maximum sentence was appropriate and the court considered Watson's acceptance of responsibility in addition to aggravating factors in determining the maximum period of incarceration. *See* 17-A M.R.S. § 1602(1)(B); *Commeau*, 2004 ME 78, ¶ 19, 852 A.2d 70; *Burdick*, 2001 ME 143, ¶ 13, 782 A.2d 319.

court, we review for obvious error. *See State v. Commeau*, 2004 ME 78, ¶ 19, 852 A.2d 70; *State v. Burdick*, 2001 ME 143, ¶ 13, 782 A.2d 319; *see also State v. Nichols*, 2013 ME 71, ¶ 23, 72 A.3d 503; *cf. State v. Butsitsi*, 2015 ME 74, ¶¶ 19-23, 118 A.3d 222 (applying obvious error review to claims of judicial bias in sentencing). Error is obvious "when there is (1) an error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, we must also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings before we vacate a judgment on the basis of the error." *Nichols*, 2013 ME 71, ¶ 23, 72 A.3d 503 (citation and quotation marks omitted).

## B.  Sentence Review

### 1.  General Objectives of Appellate Sentence Review

[¶19]  The Legislature established the Sentence Review Panel process nearly thirty-five years ago, in response to an article by then-Justice Daniel E. Wathen, to authorize appellate review "to govern the exercise of discretion by the sentencing judge in order to promote uniformity in sentencing." Hon. Daniel E. Wathen, *Disparity and the Need for Sentencing Guidelines in Maine: A Proposal for Enhanced Appellate Review*, 40 Me. L. Rev. 1, 2 (1988); *see* P.L. 1989, ch. 218, § 5 (effective Sept. 30, 1989) (codified as subsequently

amended at 15 M.R.S. §§ 2151-2157 (2023)); L.D. 44, Statement of Fact (114th Legis. 1989) ("This bill specifically seeks to implement the proposed changes in sentence review in Maine as reflected in the recent Maine Law Review article authored by Supreme Judicial Court Associate Justice Daniel E. Wathen."). Not an advocate of rigid sentencing guidelines, Justice Wathen instead proposed a process of discretionary appellate review of sentences "as an effective means of articulating and implementing a rational sentencing policy" and providing guidance to sentencing courts and the public. Wathen at 2-3, 34. This statutory scheme was enacted effective September 30, 1989, and as subsequently amended, remains in effect today. *See* 15 M.R.S. §§ 2151-2157.

[¶20] The statute prescribes the objectives of our discretionary sentence review as follows:

> **1. Sentence correction.** To provide for the correction of sentences imposed without due regard for the sentencing factors set forth in this chapter;
>
> **2. Promote respect for law.** To promote respect for law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process;
>
> **3. Rehabilitation.** To facilitate the possible rehabilitation of an offender by reducing manifest and unwarranted inequalities among the sentences of comparable offenders; and

**4. Sentencing criteria.** To promote the development and application of criteria for sentencing which are both rational and just.

15 M.R.S. § 2154. The statute provides that we must consider (1) the "propriety" of a sentence, with regard to "the nature of the offense, the character of the offender, the protection of the public interest, the effect of the offense on the victim and any other relevant sentencing factors recognized under law," and (2) the "manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based." 15 M.R.S. § 2155. "In determining whether the sentencing court disregarded the statutory sentencing factors, abused its sentencing power, permitted a manifest and unwarranted inequality among sentences of comparable offenders, or acted irrationally or unjustly in fashioning a sentence, we afford the trial court considerable discretion." *State v. Hamel*, 2013 ME 16, ¶ 5, 60 A.3d 783 (quotation marks omitted).

## 2. Statutory Sentencing Goals

[¶21] The Legislature has established in Part 6 of Title 17-A of the Maine Revised Statutes sentencing purposes or goals to "create consistency among sentences for similar offenses while encouraging individualization of each sentence based on circumstances specific to the case and the defendant." *State*

*v. Bentley,* 2021 ME 39, ¶ 11, 254 A.3d 1171. The sentencing goals are set out in 17-A M.R.S. § 1501, which states:

The general purposes of the provisions of this Part are to:

**1. Prevent crime.** Prevent crime through the deterrent effect of sentences, the rehabilitation of persons and the restraint of individuals when required in the interest of public safety;

**2. Encourage restitution.** Encourage restitution in all cases in which the victim can be compensated and other purposes of sentencing can be appropriately served;

**3. Minimize correctional experiences.** Minimize correctional experiences that serve to promote further criminality;

**4. Provide notice of nature of sentences that may be imposed.** Give fair warning of the nature of the sentences that may be imposed on the conviction of a crime;

**5. Eliminate inequalities in sentences.** Eliminate inequalities in sentences that are unrelated to legitimate criminological goals;

**6. Encourage just individualization of sentences.** Encourage differentiation among persons with a view to a just individualization of sentences;

**7. Elicit cooperation of individuals through correctional programs.** Promote the development of correctional programs that elicit the cooperation of convicted individuals;

**8. Permit sentences based on factors of crime committed.** Permit sentences that do not diminish the gravity of offenses, with reference to the factors, among others, of:

**A.** The age of the victim, particularly of a victim of an advanced age or of a young age who has a reduced ability to self-protect or who suffers more significant harm due to age;

**B.** The selection by the person of the victim or of the property that was damaged or otherwise affected by the crime because of the race, color, religion, sex, ancestry, national origin, physical or mental disability, sexual orientation, gender identity or homelessness of the victim or of the owner or occupant of that property; and

**C.** The discriminatory motive of the person in making a false public alarm or report in violation of section 509, subsection 1; and

**9. Recognize domestic violence and certified domestic violence intervention programs.** Recognize domestic violence as a serious crime against the individual and society and to recognize domestic violence intervention programs certified pursuant to Title 19-A, section 4116 as the most appropriate and effective community intervention in cases involving domestic violence.

17-A M.R.S. § 1501.

[¶22]  The court must consider the sentencing goals at each of the steps of the sentencing process and "articulate which sentencing goals are served by the sentence." *Reese*, 2010 ME 30, ¶¶ 17, 34, 991 A.2d 806.  Depending upon the facts and circumstances presented in an individual case, some goals may or may not be relevant, and some may be in tension with others. *Id.*; *Bentley,* 2021 ME 39, ¶ 11, 254 A.3d 1171.  Because it can be challenging in a given case to reconcile potentially disparate sentencing goals, the trial court is generally

afforded "significant leeway" in determining which factors are considered and the weight a factor is assigned. *Bentley,* 2021 ME 39, ¶ 11, 254 A.3d 1171; *see also Hamel*, 2013 ME 16, ¶ 8, 60 A.3d 783. At the same time, even though a sentencing court is not required to consider or discuss every argument or factor the defendant raises, it must still "articulate which sentencing goals are served by the sentence" and must not "disregard significant and relevant sentencing factors." *Reese*, 2010 ME 30, ¶¶ 17, 34, 991 A.2d 806.

### 3. Review of the Final Sentence

[¶23]  In its step-three analysis, the court, after indicating that it did "consider all of the general sentencing provisions, the purposes under Title 17-A, section 1501,"[13] identified what it considered to be the paramount sentencing goal in this case: the "restraint of individuals when required in the interest of public safety." The basis for this conclusion was "the profound interconnection of drugs with homicides, at least in the Court's experience," and the court's resulting determination that "the restraint of individuals is, in fact, in the interest of public safety, even though the prevailing elite consensus

---

[13] The court's full consideration of the section 1501 sentencing goals consisted of recognizing that "restitution is really not relevant"; agreeing that "we should consider purpose three, minimizing correctional experience"; and further agreeing that "we should provide notice of the nature of sentences that may be imposed and encourage just individuation of sentences, permit sentences based on factors of the crime committed, one of which the [L]egislature says is that we should permit sentences that do not diminish the gravity of offenses."

seems to be that we should treat drug addiction as a mental health issue as opposed to a public safety issue."

[¶24] Watson contends that the court's invocation of public safety as the overriding statutory sentencing goal in this case was unsupported by the record, and, further, that the court's ultimate decision to impose a three-year, unsuspended sentence not only disregarded or marginalized other relevant sentencing factors but also effectively nullified the probated sentence she had received less than one month earlier, thereby undermining another stated sentencing goal, rehabilitation.

[¶25] Although "heightened deference" is afforded to the determination whether to suspend any portion of the maximum sentence in arriving at a final sentence, *State v. Gordon,* 2021 ME 9, ¶ 17, 246 A.3d 170; *see also State v. Prewara*, 687 A.2d 951, 953 (Me. 1996), there are, nonetheless, limits that we have been entrusted to enforce in order to ensure that sentencing both systemically and in individual cases is proper, fair, and consistent with legislative purposes. *See* 15 M.R.S. §§ 2154, 2155 (2023). Even apart from the propriety of a particular sentence, we are tasked with reviewing the manner in which a sentence was imposed, including "the sufficiency and accuracy of the information on which it was based." 17-A M.R.S. § 2155(2). Here, we agree

with Watson that the manner in which this sentence was imposed constituted an abuse of discretion.

[¶26] The court's primary reliance on the "interconnection of drugs with homicides" has no basis in the record. The conduct for which Watson was convicted did not involve violence of any nature or the use or possession of any weapons. There was no evidence that Watson had ever been violent, or that the co-defendant in this case, or any other individuals with whom she has associated, was violent. There was no evidence that Watson presented any threat to the public by operating a motor vehicle while intoxicated. At the time of the incident in question, she was a passenger in the vehicle, not the driver. Although she does have a history of prior convictions, none involve driving while intoxicated or violent conduct of any nature; most, if not all, were related to substance use.

[¶27] Rather, the court's rationale for placing so much weight on the goal of restraint for the protection of the public derived from its own prior personal experience as a homicide prosecutor and an apparent belief that incarcerating "[p]eople situated like Ms. Watson who were desperate to get the next fix or were desperate to become involved in some sort of drug imbroglio"—that is, drug users—is necessary to reduce violent crime. This type of generalization—

with no evidence in the record connecting Watson with violence or other behaviors directly implicating public safety—undermines the sentencing goal of "differentiation among persons with a view to a just individualization of sentences." 17-A M.R.S. § 1501(6). *Cf. State v. Gonzales*, 604 A.2d 904, 906-07 (Me. 1992) (stating—before *Hewey*—that in the absence of evidence of previous drug dealings or involvement in a Dominican drug ring, it would be improper to consider the State's argument that the defendant's aggravated trafficking offense was "more serious because the Dominicans dominate the drug trade in Lewiston").

[¶28]  It is not improper for judges to "use their own knowledge and experience when considering an appropriate sentence." *State v. Bennett*, 2015 ME 46, ¶ 26, 114 A.3d 994.[14]  However, courts may not adopt a rigid approach

---

[14]  In *State v. Bennett*, a pawnshop employee who was convicted after trial of the Class D offense of receiving stolen property and sentenced to fourteen days in jail challenged the constitutionality of his sentence through a direct appeal from the court's judgment.  2015 ME 46, ¶¶ 1, 11, 114 A.3d 994. He raised several grounds, including that the trial court had violated his due process rights because the sentence was "based on factually unreliable information, and he was not given an opportunity to refute the information relied on at sentencing."  *Id.* ¶ 21.  As relevant here, Bennett focused on comments by the trial court about the prevalence of drug-related burglaries and pawnshops buying stolen property.  *Id.* ¶ 10.  Addressing the employee at sentencing, the trial court observed that drug-seekers often "have no legitimate way of making the kind of money they need to support their addiction, so they steal things," and "your business and a number of others routinely take stolen items."  *Id.* (quotation marks omitted).

We rejected Bennett's due process challenge because the evidence at trial "overwhelmingly established" that he knew that the property had been stolen, had previously purchased property from the same seller that he knew to be stolen, and had intended to buy more from the same seller in the future.  *Id.* ¶ 25.  We stated that "[i]t is not improper for judges, who are confronted daily with the many consequences of drug addiction, including charges of theft, burglary, and other drug-related

to sentencing based on their own beliefs or philosophies.  *See United States v. Foss,* 501 F.2d 522, 527 (1st Cir. 1974) (holding that "any kind of mechanical sentencing that steadfastly ignores individual differences is to be avoided");[15] *cf. United States v. Charles,* 460 F.2d 1093, 1094-95 (6th Cir. 1972) (holding that the sentencing judge had acted impermissibly when applying an inflexible standard to those who refused to report for military service when drafted); *State v. Martin,* 302 N.W.2d 58, 59 (Wis. Ct. App. 1981) (concluding that the sentencing court erred in refusing to consider a probation alternative for a defendant convicted of delivery of a controlled substance).

---

crimes, to use their own knowledge and experience when considering an appropriate sentence," *id.* ¶ 26, and held that "[t]he [sentencing] court's understanding of the relationship between drug addiction and the unlawful taking of property to be sold at pawnshops is not the type of factually unreliable information that we have determined deprives a defendant of his right to due process," *id.* ¶ 27.

The question presented in this appeal is different from that in *Bennett.*  Here, we are considering the propriety of a sentence under 15 M.R.S. §§ 2154-2155 (2023).  The issue here is whether reliance on its own personal experiences and beliefs constrained the court from properly individualizing the sentence, from taking into account "all of the information necessary and appropriate to the exercise of its discretion," *State v. Stanislaw,* 2011 ME 67, ¶ 15, 21 A.3d 91 (quotation marks omitted), and from balancing and articulating the relevant sentencing goals.

[15]  In *United States v. Foss,* the United States Court of Appeals for the First Circuit, in reviewing the *legality* as opposed to *propriety* of a sentence prior to the adoption of federal guidelines, upheld—noting that it "d[id] not say by much"—a severe sentence for cocaine possession despite the sentencing judge's remarks that "[a]nyone who facilitates the transactions in the hard narcotics . . . has to be made a lesson of, to cut down on the traffic, to cut down on relatively innocent persons like yourselves, who got caught up in the drug subculture . . . . [I]t is a question of the welfare of young people in this community . . . ."  501 F.2d 522, 525, 529 (1st Cir. 1974) (quotation marks omitted).

22

[¶29]  The court's references to the "elite consensus," "elite circles," and "elite opinion" concerning "the shift in approach in drug cases" reinforce a perception that the sentence imposed here was based on preconceived beliefs or philosophies rather than an individualized assessment of the circumstances presented, and these references furthered no legitimate criminological goal. Characterizing rehabilitation efforts through mental health and substance use treatment as "elite" theories[16] undermines to an extent several legislatively

---

[16]  The vast weight of research and evidence-based authority supports—as an alternative to incarceration—the use of mental health or medical care, or both, to treat the substance use disorders of those convicted of nonviolent crimes arising from their drug use.  "We have known for decades that addiction is a medical condition—a treatable brain disorder—not a character flaw or a form of social deviance."  Nora D. Volkow, *Addiction Should Be Treated, Not Penalized*, 46 Neuropsychopharmacology 2048, 2048 (Aug. 2021).  A study published in 2018 found that "higher rates of drug imprisonment did not translate into lower rates of drug use, arrests, or overdose deaths."  The Pew Charitable Trusts, Issue Brief, *More Imprisonment Does Not Reduce State Drug Problems*, at 5 (Mar. 2018).  Drug court programs that incorporate treatment reduce recidivism, significantly decrease substance use among participants, and improve participants' quality of life. Kristen DeVall et al., Nat'l Drug Ct. Res. Ctr., *Painting the Current Picture: A National Report on Treatment Courts in the United States*, at 42-43 (2022).  In Maine, the Legislature has authorized the Judicial Branch to "establish substance use disorder treatment programs in the Superior Courts and District Courts" in order to reduce substance use and dependency, criminal recidivism, and overcrowding in prisons.  4 M.R.S. § 421(1), (2) (2023).  The Judicial Branch reported in 2023 that "[d]uring the past twenty-one years of continuous operation, Maine's Treatment Courts have continued to offer a successful, evidence-based approach to the challenge of substance use and crime in the State of Maine."  Amanda J. Doherty, State of Maine Judicial Branch, Report to the Joint Standing Committee on Judiciary: 2022 Annual Report on Maine's Drug Treatment Courts, at 19 (Feb. 15, 2023), https://legislature.maine.gov/doc/10024 [https://perma.cc/KPZ6-MGAP].  Internationally, the United Nations Office on Drugs and Crime and World Health Organization have said, "[I]ncarceration has severe negative consequences for people with drug use disorders, their families and their communities, and incarceration can worsen the underlying health and social conditions associated with drug use. . . . When a person with a drug use disorder comes into contact with the criminal justice system, it provides an opportunity to encourage that person to receive appropriate treatment."  United Nations Office on Drugs and Crime and World Health Organization, *Treatment and Care for People with Drug Use Disorders in Contact with the Criminal Justice System: Alternatives to Conviction or Punishment*, at 2 (2019), https://syntheticdrugs.unodc.org/uploads/ syntheticdrugs/res/library/treatment_html/Alternatives_to_Conviction_or_Punishment_treatment_

established goals of sentencing implicated here, including "[p]revent[ing] crime through . . . the rehabilitation of persons," "[m]inimiz[ing] correctional experiences that serve to promote further criminality," and "[e]ncourag[ing] differentiation among persons with a view to a just individualization of sentences." 17-A M.R.S. § 1501(1), (3), (6).

[¶30] Directed, as we are, "[t]o facilitate the possible rehabilitation of an offender by reducing manifest and unwarranted inequalities among the sentences of comparable offenders," 15 M.R.S. § 2154(3), we must scrutinize closely a determination that imposes a substantial period of incarceration despite an almost entirely probated sentence imposed less than a month prior by another judge on the same defendant for similar conduct. And this implicates a further concern about the manner in which the court arrived at the final sentence.

[¶31] The court did not adequately address a sentencing goal that prominently overshadowed the hearing in this case—the "[e]liminat[ion of] inequalities in sentences that are unrelated to legitimate criminological

and_care_for_people_with_drug_use_disorders_in_contact_with_the_criminal_justice_system_joint_U NODC-WHO.pdf [https://perma.cc/ZSC9-XVJP]. Effective drug dependence treatment is therefore endorsed by these international organizations as an appropriate intervention, including as an alternative to incarceration. *Id.* at 4-12.

24

goals,"[17] 17-A M.R.S. § 1501(5), and it gave virtually no consideration beyond mere mention to the closely related goal of minimizing correctional experiences, *id.* § 1501(3). As noted, this same defendant had received (and was about to begin) a probated sentence. *See State v. Nolan*, 2000 ME 165, ¶ 9, 759 A.2d 721 (describing probation as "a device designed to assist individuals in reintegrating into society" that "may be premised on reasonable conditions that are tailored to a particular probationer's needs"). Without addressing the specific circumstances that justified the stark disparity between the sentences imposed on this defendant, the court imposed a three-year term of incarceration without probation, effectively nullifying the previously imposed sentence.

[¶32] The failure to reconcile the two sentences casts doubt upon whether the court "considered all of the information necessary and appropriate

---

[17] While recognizing Watson's acceptance into a program designed to address her substance use disorder and help her succeed on probation, the court credited her attorney—not Watson—for that effort and further acknowledged Esther House's "good will and good faith in working with Ms. Watson." Although the court stated that it "d[id] not believe, given Ms. Watson's record, that placing her on probation [was] going to be an effective correctional alternative," it provided no further explanation as to what "legitimate criminological goal[]" was served by incarcerating her for the duration of the probated sentence ordered weeks earlier by another court. 17-A M.R.S. § 1501(5) (2023). Although restraint of an individual may be a legitimate goal, *see id.* § 1501(1), the court's prefatory statements concerning the suitability of treatment as an alternative to incarceration suggest that the court's rationale for diverging from, and nullifying, the earlier sentence may have been rooted in generalized notions about the proper response to substance use disorders rather than a more individualized assessment of the particular circumstances here.

to the exercise of its discretion." *State v. Stanislaw*, 2011 ME 67, ¶ 15, 21 A.3d 91 (quotation marks omitted); *see also State v. Sweet,* 2000 ME 14, ¶ 10, 745 A.2d 368 (providing that "while addressing the many goals of sentencing, the court must endeavor to create consistency among sentences for similar crimes and must, at the same time, tailor the sentence to the individual defendant").

[¶33]  Thus, by failing to address the "manifest inequality" between the two sentences imposed on Watson delivered within weeks of each other; by elevating above all other sentencing purposes the need for restraint in the interest of public safety based upon personal beliefs and not the sentencing record; and by not giving due consideration to, and sufficiently explaining, either the effect on the probated sentence just entered by another court or the inadvisability of a viable rehabilitative treatment option as an alternative to incarceration, the court abused its discretion in the manner in which this sentence was imposed.  *See* 15 M.R.S. §§ 2154(3), 2155(2); *cf. State v. MacDonald*, 1998 ME 212, ¶¶ 19-20, 718 A.2d 195 (vacating a sentence when the court disregarded the mitigating factor of the defendant's actions in pulling a person out of harm's way and warning others about the fire after committing arson).

[¶34]   This constitutes error that is plain and that affects Watson's substantial rights, *Nichols*, 2013 ME 71, ¶ 23, 72 A.3d 503.   Because of the importance of the liberty interest at stake in this matter and the need to ensure that due consideration is given to all relevant and proper sentencing factors—and no improper factors—when determining a sentence, we further conclude that "the error seriously affects the fairness and integrity or public reputation of judicial proceedings."   *Id.* ¶ 23 (quotation marks omitted).

[¶35]   Having concluded that the court committed obvious error, we vacate and remand for resentencing consistent with this opinion.

The entry is:

> Sentence vacated.   Remanded for resentencing consistent with this opinion.

---

Neil J. Prendergast, Esq. (orally), Fort Kent, for appellant Tara L. Watson

Maeghan Maloney, District Attorney, Francis J. Griffin, Jr., Asst. Dist. Atty. (orally), and Sarah Gracie, Stud. Atty., Office of the District Attorney, Skowhegan, for appellee State of Maine

Somerset County Unified Criminal Docket docket number CR-2022-509
FOR CLERK REFERENCE ONLY