MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2018 ME 117
Docket:      Som-17-489
Argued:      June 13, 2018
Decided:     August 14, 2018

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:    SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Concurrence:SAUFLEY, C.J., and GORMAN and JABAR, JJ.

## STATE OF MAINE

v.

## J.R.

MEAD, J.

[¶1]    J.R. appeals from the judgment of the District Court (Skowhegan, *Benson, J.*), sitting as the juvenile court, that adjudicated him of having committed two counts of criminal mischief (Class D), 17-A M.R.S. § 806(1)(A) (2017), and three counts of theft (Class E), 17-A M.R.S. §§ 353(1)(A), 359(1)(A) (2017).  The court ordered that J.R. be committed to the Long Creek Youth Development Center (Long Creek) for an indeterminate period not to exceed his eighteenth birthday.  *See* 15 M.R.S. §§ 3313(1)-(2), 3314(1), 3316(2) (2017).  J.R. contends that the court abused its discretion or otherwise erred when it determined that commitment to a secure juvenile correctional institution was the least restrictive dispositional alternative

available without explicitly finding that J.R.'s commitment was necessary to protect the public.[1]  He further contends that his indeterminate commitment until age eighteen is disproportionate punishment because it potentially incarcerates him for a longer term than the maximum length of a sentence for an adult convicted of similar misdemeanor crimes.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  J.R. was born on March 3, 2001.  He was fifteen when the State filed, on January 13, 2017, the first of the three juvenile petitions that are the subject of this appeal.  In docket number SKODC-JV-17-0005 (17-0005), the State alleged that, on November 15, 2016, J.R. "receive[d], retain[ed], or dispose[d] of a scooter, . . . knowing it had been stolen, or believing probably that it had been stolen, with the intent to deprive [the owner] of the property," and that he damaged the scooter by "painting" the number "420" on it.  The petition in 17-0005 charged J.R. with theft by receiving stolen property (Class E), 17-A M.R.S. § 359(1)(A), and criminal mischief (Class D), 17-A M.R.S. § 806(1)(A).

---

[1]  The American Civil Liberties Union of Maine Foundation (MCLU) submitted an amicus curiae brief and has joined all of J.R.'s arguments and assertions.  MCLU further argues that juvenile commitments to Long Creek constitute cruel and unusual punishment because of purported conditions and alleged deficiencies at that institution.

[¶3]  On February 27, 2017, J.R. appeared at an initial hearing and denied both charges.  The court ordered his release on the conditions that he (1) refrain from any illegal acts, including the use of alcohol or illegal drugs; (2) remain under house arrest when not at school, travelling to or from school, or under the supervision of his parents or someone approved by his Juvenile Community Corrections Officer (JCCO); (3) have no contact with the owner of the scooter or the juveniles involved in its theft or reporting it stolen to the police; and (4) report regularly to his JCCO.  The court set the matter for an adjudicatory hearing on April 10, 2017.

[¶4]  Before that next hearing occurred, however, the State filed a second petition, which was entered in docket number SKODC-JV-17-0021 (17-0021). The petition charged J.R. with aggravated criminal mischief (Class C), 17-A M.R.S. § 805(1)(A) (2017), alleging that on February 19, 2017, he "did intentionally, knowingly, or recklessly damage or destroy windows, doors and surveillance cameras," causing in excess of $2,000 in damage at a public school. On April 10, 2017, at the time the court had previously set for the adjudicatory hearing in 17-0005, J.R. initially appeared and denied the aggravated criminal mischief charge.  The court released J.R. under the same conditions it had previously imposed, with the added requirements that J.R. (1) submit to

4

searches or tests for possession or use of drugs or alcohol, (2) set up case management services, and (3) attend individual counseling. The court (*Mathews, J.*) continued the adjudicatory hearing in both matters to June 12, 2017. The State agreed to conditions of release and to a two-month continuance of the adjudicatory hearing in docket number 17-0005 to "try and treat [J.R.] in the community," with the understanding that "if he attended and participated in . . . counseling, then [it] would [have] recommend[ed] . . . a probation[ary] sentence and . . . restitution."

[¶5] In the period following the continuance, however, J.R. did not meaningfully participate in services. He attended only a few brief counseling sessions, which the counselor then discontinued due to J.R.'s lack of engagement. When J.R. failed to appear at the adjudicatory hearing on June 12, the court ordered a warrant for his arrest and subsequent detention, which issued later that month. While J.R.'s whereabouts were unknown, the State filed a third petition against him. That petition, entered in SKODC-JV-17-0034 (17-0034), charged J.R. with burglary (Class B), 17-A M.R.S. § 401(1)(B)(4) (2017), and two counts of theft by unauthorized taking or transfer (Class E), 17-A M.R.S. § 353(1)(A). The State alleged that on June 8, 2017, J.R. broke through the front door of his brother's apartment and stole a safe containing

money, marijuana, and documents belonging to his brother and the brother's roommate. On July 25, 2017, a second arrest warrant issued for J.R.

[¶6] On October 12, 2017, law enforcement took J.R. into custody and, after a hearing the next day, the court (*Benson, J.*) ordered him to remain detained until the adjudicatory hearing later in the month. *See* 15 M.R.S. § 3203-A(5) (2017). At the adjudicatory hearing, the parties informed the court that J.R. intended to withdraw his previous pleas and tender an "open plea" admitting to the criminal mischief and theft charges in 17-0005 and to a drug paraphernalia charge, which is not a subject of this appeal.[2] In exchange, the State declined to proceed on the aggravated criminal mischief or burglary charges against J.R.; it amended the aggravated criminal mischief charge in 17-0021 to simple criminal mischief and dismissed the burglary charge in 17-0034, leaving only misdemeanor charges in those dockets.

[¶7] After J.R. admitted to the offenses of receiving stolen property and criminal mischief in 17-0005 and the amended charges of unauthorized taking in 17-0034 and criminal mischief in 17-0021, the court found, based upon a thorough colloquy with J.R., that "his admissions [were] knowing and voluntary." The court then proceeded to determine an appropriate disposition.

---

[2] The drug paraphernalia case carried with it no possibility of incarceration, and no appeal was taken. *See* 17-A M.R.S. § 1111-A (2017).

[¶8]   Regarding the disposition of J.R.'s case, the court and the State expressed that their ultimate objective was "rehabilitation of the juvenile."  The court further explained that, to fulfill the overarching intent of the Maine Juvenile Code, "the Court is bound to impose the least restrictive dispositional alternative."   The court rejected the possibility of a straight probationary disposition, stating "there's just no indication that . . . if I were to [order probation] . . . that [it] would succeed."   The court was apparently—and appropriately—frustrated by a lack of suitable alternatives for treating J.R. in the community: "Looking at [the factors for withholding an institutional disposition], everyone up to this point has bent over backwards in order to impose the least restrictive alternative so that you could try to succeed . . . . And up to this point, you just haven't justified the confidence."

[¶9]   The court ordered that J.R. be committed to an approved juvenile detention facility for an indeterminate period not to exceed his eighteenth birthday.  J.R. timely appealed.  15 M.R.S. §§ 3402-3403 (2017); M.R. App. P. 2B.

## II.  DISCUSSION

[¶10]   J.R. argues that the court abused its discretion and otherwise erred[3] when it determined that a disposition committing him to Long Creek was

---

[3] We decline to reach the arguments advanced principally by MCLU, and to a lesser extent by J.R., that attack the court's disposition as an abuse of discretion or cruel and unusual punishment solely

the least restrictive alternative, absent any explicit finding that his commitment was necessary to protect the public. *See* 15 M.R.S. §§ 3002(1)(A), 3313-3314 (2017). J.R. also argues that his commitment to Long Creek offends constitutional principles of proportional punishment. Pursuant to 15 M.R.S. §§ 3401(2) and 3402(1)(B) (2017), we review a juvenile disposition for an abuse of discretion and "errors in the application and interpretation of law," "[t]o [e]nsure substantial uniformity of treatment to persons in like situations," and "so that the legislatively defined purposes of the juvenile justice system as a whole are realized." *See State v. G.F.*, 2015 ME 90, ¶¶ 2-3, 119 A.3d 743. We begin by reviewing the purposes behind juvenile dispositions and comparing those purposes to the notably different objectives for the sentencing of adult defendants. We then separately address the arguments regarding the least restrictive alternative and proportionality.

A.    The Maine Juvenile Code

[¶11] The juvenile court correctly noted the Maine Juvenile Code's stated preference for keeping juveniles in the home, whenever possible, and its

---

on the grounds of alleged deficiencies and conditions claimed to exist at the Long Creek Youth Development Center. J.R. did not raise these arguments to the court at its adjudicatory proceeding, and the record contains no competent evidence to support such arguments here. *See State v. Cote*, 2017 ME 73, ¶ 25, 159 A.3d 831 (assigning to appellant the "burden of demonstrating error"); *State v. Dominique*, 2008 ME 180, ¶ 25, 960 A.2d 1160.

emphasis upon rehabilitation. Title 15 M.R.S. § 3002(1) (2017) provides the purposes of the Juvenile Code:

> **A.** To secure for each juvenile subject to these provisions such care and guidance, preferably in the juvenile's own home, as will best serve the juvenile's welfare and the interests of society;
>
> **B.** To preserve and strengthen family ties whenever possible, including improvement of home environment;
>
> **C.** To remove a juvenile from the custody of the juvenile's parents only when the juvenile's welfare and safety or the protection of the public would otherwise be endangered or, when necessary, to punish a child adjudicated, pursuant to chapter 507, as having committed a juvenile crime;
>
> **D.** To secure for any juvenile removed from the custody of the juvenile's parents the necessary treatment, care, guidance and discipline to assist that juvenile in becoming a responsible and productive member of society;
>
> **E.** To provide procedures through which the provisions of the law are executed and enforced and that ensure that the parties receive fair hearings at which their rights as citizens are recognized and protected; and
>
> **F.** To provide consequences, which may include those of a punitive nature, for repeated serious criminal behavior or repeated violations of probation conditions.

Rehabilitation remains among the goals even in situations requiring the removal of a juvenile from the custody of his parents: when "confinement is necessary for protection of the public" because it will (1) prevent the juvenile from committing another crime, (2) most effectively provide correctional

treatment to the juvenile, or (3) avoid "depreciat[ing] the seriousness of the juvenile's conduct." 15 M.R.S. §§ 3002(1)(C), 3313(1)(A)-(C) (2017).

[¶12] Commentary from the 1979 amendment to sections 3002 and 3313 also evinces the Legislature's preference for treatment in the community. The 1979 commentary states that the intent of those sections is "to give priority to the least restrictive . . . disposition (section 3313) that is appropriate." *See* 1979 Commentary at 398, 479, *included with* 15 M.R.S.A. §§ 3002, 3313 (2003). Further emphasizing the Juvenile Code's intent to avoid the institutional commitment of a juvenile when possible, 15 M.R.S. § 3313(2) lists several factors weighing against an institutional disposition, and the very next section of the statute affords the juvenile court various alternatives to consider before ordering an institutional disposition, 15 M.R.S. § 3314(1)-(2) (2017). By contrast, the Legislature has established sentencing objectives for adults that reflect notably different priorities.[4]

---

[4]    **§ 1151. Purposes**

The general purposes of the provisions of this part are:

   **1.**   To prevent crime through the deterrent effect of sentences, the rehabilitation of convicted persons, and the restraint of convicted persons when required in the interest of public safety;

   **2.**   To encourage restitution in all cases in which the victim can be compensated and other purposes of sentencing can be appropriately served.

   **3.**   To minimize correctional experiences which serve to promote further criminality;

10

[¶13] An argument akin to those advanced by J.R. has been presented to us previously. Nearly forty years ago, we upheld the constitutionality of the Maine Juvenile Code against a fourteen-year-old's equal protection and due process challenge to his indeterminate commitment for a "possible seven[-]year term [that was] on its face longer than the five[-]year term [that]

---

**4.** To give fair warning of the nature of the sentences that may be imposed on the conviction of a crime;

**5.** To eliminate inequalities in sentences that are unrelated to legitimate criminological goals;

**6.** To encourage differentiation among offenders with a view to a just individualization of sentences;

**7.** To promote the development of correctional programs that elicit the cooperation of convicted persons;

**8.** To permit sentences that do not diminish the gravity of offenses, with reference to the factors, among others, of:

> **A.** The age of the victim, particularly of a victim of an advanced age or of a young age who has a reduced ability to self-protect or who suffers more significant harm due to age; and
>
> **B.** The selection by the defendant of the person against whom the crime was committed or of the property that was damaged or otherwise affected by the crime because of the race, color, religion, sex, ancestry, national origin, physical or mental disability, sexual orientation or homelessness of that person or of the owner or occupant of that property; and

**9.** To recognize domestic violence as a serious crime against the individual and society and to recognize batterers' intervention programs certified pursuant to Title 19-A, section 4014 as the most appropriate and effective community intervention in cases involving domestic violence.

17-A M.R.S. § 1151 (2017). The Legislature amended section 1151 after the court's adjudicatory hearing in this case, but not in a way that alters the analysis here. *See* P.L. 2017, ch. 105, §§ 1-3 (effective Nov. 1, 2017).

might have been imposed upon an adult convicted of a similar offense." *State v. Gleason*, 404 A.2d 573, 586 (Me. 1979). We held then that the Juvenile Code's "goals of rehabilitation and treatment, now in large degree eschewed by the sentencing provisions of the Maine Criminal Code, justif[ied] longer indeterminate sentences for juveniles" because those features of the juvenile system were a rational basis for sentencing young offenders differently.[5] *Id*.

[¶14] Today, the goal of rehabilitation clearly remains at the heart of the Juvenile Code. In the years following our decision in *Gleason*, the Legislature has enacted only minor changes to the express purposes of the Juvenile Code and the criteria for withholding an institutional disposition. *See* Historical and Statutory Notes at 399, 479, *included with* 15 M.R.S.A. §§ 3002, 3313 (2003).[6] We turn now to J.R.'s argument that the court should have ordered a less restrictive disposition.

---

[5] The U.S. Supreme Court, in dicta, has more recently observed a similarly persistent distinction between the federal criminal code and the juvenile justice statute. *United States v. R.L.C.*, 503 U.S. 291, 298 n.2 (1992) (plurality opinion) ("While it is true that some rehabilitative tools were removed from the juvenile penalty scheme in 1984, . . . ([such as] parole . . .), the [current statute] does not completely reject rehabilitative objectives.").

[6] Since 1979, the Legislature has only twice amended 15 M.R.S. §§ 3002 and 3313 (2017). *See* P.L. 1979, ch. 663, § 113 (effective Mar. 28, 1980) (amending sections 3002 and 3313); P.L. 1995, ch. 690, § 5 (effective July 4, 1996) (amending section 3313); P.L. 1997, ch. 645, § 1 (effective June 30, 1998) (amending section 3002). During that same time frame, 15 M.R.S. § 3314 (2017) has undergone numerous substantive amendments, many of which expanded the number and type of alternative dispositions that a court may impose. *See* Historical and Statutory Notes at 484-87, *included with* 15 M.R.S.A. § 3314 (2003). None of the amendments altered these sections' explicit focus on rehabilitation as the desired outcome.

1.    The Least Restrictive Dispositional Alternative

[¶15]   Despite the predominantly rehabilitative purposes behind the Juvenile Code generally, and the criteria for institutional dispositions more specifically, J.R. asserts that commitment to Long Creek is not rehabilitative but punitive.  J.R. argues in the alternative that even if such commitments can serve the objective of rehabilitation, the court nonetheless abused its discretion because committing him for an indeterminate period was not the least restrictive disposition.

[¶16]   As J.R. notes, section 3314 provides for various dispositional alternatives, such as probation, that are less restrictive than commitment. *See* 15 M.R.S. § 3314(1)(E), (H), (2) (2017).  In the circumstances presented here, the only meaningful less restrictive alternative to commitment was to place J.R. on probation.  The court recognized as much during the hearing.  What J.R. fails to convincingly argue, however, is that any of those alternatives would have effectively protected the public and provided meaningful and effective rehabilitation resources for him.  *See id.* § 3313(1).  The record belies J.R.'s suggestion that a disposition placing him on probation would have been effective to (1) mitigate the "undue risk that, during the period of a suspended sentence or probation, [J.R. would] commit another crime"; (2) provide J.R. with

the "correctional treatment" he needs; and (3) avoid "depreciat[ing] the seriousness" of his repeated criminal conduct. *Id.* § 3313(1)(A)-(C).

[¶17] Although the court did not expressly identify those concerns as the grounds for its disposition, "[w]e have never required the sentencing judge to address each of the factors set out [in the sentencing statute] and explicitly negate them." *State v. Commeau*, 2004 ME 78, ¶ 22, 852 A.2d 70. In arriving at the disposition here, it is clear that the court took the factors in section 3313 into account. The court specifically referred to "a number of factors that I am supposed to look at in determining whether . . . to withhold an institutional disposition." We therefore infer from the record that the court appropriately considered the factors in section 3313. *Id.*

[¶18] Against those controlling factors that persuaded the court that J.R.'s commitment was necessary to protect the public, J.R. counters that he did not contemplate or cause any harm by his conduct and had no prior adjudicatory record. *See* 15 M.R.S. § 3313(2)(A)-(B), (G) (2017). The additional considerations J.R. offers, although they do weigh against an institutional disposition pursuant to the statute, do little to overtake each of the controlling factors in subsection 3313(1) that are all applicable here for a number of reasons.

14

[¶19] First, J.R. was escalating the seriousness of his criminal conduct in relatively short order. His later offenses occurred after he had been released on then-pending juvenile petitions. The trajectory of his behaviors clearly portends future crimes. Second, J.R. failed to meaningfully engage in counseling when given the opportunity to do so in the community, he disregarded his court date, and he violated the conditions of his release by committing additional crimes. The court was entitled to conclude that J.R.'s refusal to participate and meaningfully engage in voluntary counseling effectively negated the likelihood of success in any community-based counseling program. Lastly, there is no competent evidence in the record suggesting that conditions of probation would have been at all effective in curbing J.R.'s continued criminal behavior. In fact, the opposite conclusion is supported by J.R.'s choices not to appear at his court date and to violate his conditions of release. The court did not err in its application of the law or otherwise abuse its discretion; the indeterminate commitment ordered was the least restrictive disposition available to the court that could appropriately address J.R.'s needs pursuant to sections 3313(1) and 3314(2).

### 2. The Proportionality of J.R.'s Indeterminate Commitment

[¶20]  We turn next to J.R.'s argument that his indeterminate commitment is unconstitutionally disproportionate to his juvenile crimes because it potentially incarcerates him for a longer term than the sentences for adults convicted of similar property crimes.[7]  *See* U.S. Const. amends. VIII, XIV (prohibiting cruel and unusual punishment); Me. Const. art. I, § 9 ("[A]ll penalties and punishments shall be proportioned to the offense; . . . nor [shall] cruel [or] unusual punishments [be] inflicted.").  As noted above, our decision in *Gleason* has addressed and rejected a similar argument, *see supra* ¶ 13, but J.R. asks us to overrule *Gleason* as anachronistic in light of the U.S. Supreme Court's and science's increasing understanding that "children are constitutionally different from adults for the purposes of sentencing."  *Miller v. Alabama*, 567 U.S. 460, 471, 489 (2012) (declaring unconstitutional the mandatory sentencing of any juvenile offender to life without parole).  Because J.R. failed to preserve these arguments, as he did not raise them in the dispositional proceeding, we review the proportionality of the court's

---

[7] Although J.R. does argue that his commitment, which potentially extends until he is eighteen, is "unusual" and "rare," he does not argue that his disposition "offends prevailing notions of decency." *State v. Lopez*, 2018 ME 59, ¶ 15 & n.3, --- A.3d --- (quotation marks omitted).  As such, our review properly focuses on the proportionality of J.R.'s disposition compared to the nature of his offenses. *See id.*; *State v. Gilman*, 2010 ME 35, ¶ 23 & n.11, 993 A.2d 14.

disposition for obvious errors in the application of law, uniformity of treatment for like persons, and the fulfilment of the purposes of the Juvenile Code, as set out in 15 M.R.S. §§ 3401(2), 3402(2). *See State v. Butsitsi*, 2015 ME 74, ¶¶ 19, 22, 118 A.3d 222.

[¶21]  We first must recognize that "[c]ourts rarely find sentences disproportionate pursuant to the Eighth Amendment of the United States Constitution, except in cases involving the death penalty or juvenile defendants." *State v. Stanislaw*, 2013 ME 43, ¶ 26, 65 A.3d 1242. As J.R. appears to concede, his case is immediately distinguishable from the U.S. Supreme Court's line of Eighth Amendment cases regarding juvenile defendants tried as adults for the most serious types of crimes and subjected to the harshest of sentences.[8] "However, the United States Supreme Court has recognized that the Maine Constitution anticipates a broader proportionality review than the Eighth Amendment."  *Id.*  We review the proportionality of a sentence, according to article I, section 9 of the Maine Constitution, by employing a two-part test.  *Id.* ¶ 29.  "First, we compare the gravity of the offense with the

---

[8]  *See Miller v. Alabama*, 567 U.S. 460, 465-69 (2012) (regarding two fourteen-year-olds tried as adults, convicted, and sentenced to life in prison, one for felony murder and aggravated robbery, the other for murder in the course of arson); *Graham v. Florida*, 560 U.S. 48, 52-58 (2010) (involving the life sentence without parole of a sixteen-year-old charged as an adult for armed burglary with assault or battery, armed robbery, multiple attempted armed robberies, and fleeing law enforcement); *Roper v. Simmons*, 543 U.S. 551, 555-57 (2005) (concerning a seventeen-year-old charged with burglary, kidnapping, stealing, and first-degree murder; tried as an adult; and sentenced to death).

severity of the sentence. Second, if this comparison results in an inference of gross disproportionality we then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction." *Id.* (quotation marks omitted).

[¶22] J.R.'s argument, requesting that we overrule *Gleason* and determine that his disposition is disproportionate punishment, does not square with the statutory mandates applicable to his case. The Juvenile Code in Maine continues to treat juveniles differently from adult offenders, *see* 15 M.R.S. §§ 3002, 3313-3314; *Gleason*, 404 A.2d at 579-80, 586, as the U.S. Supreme Court has done in the very different context of juveniles tried as adults for crimes that potentiate sentences of death or life imprisonment, *see, e.g., Miller*, 567 U.S. at 465-69. A comparison of the purposes behind the Juvenile Code and its sections concerning dispositions with the analogous provisions of the Maine Criminal Code underscores the importance that the Juvenile Code places upon rehabilitation. *Compare* 15 M.R.S. §§ 3002, 3313-3314, *with* 17-A M.R.S. §§ 1151-1152 (2017). The U.S. Supreme Court cases cited by J.R. do nothing to change the continued consistency between Maine's current Juvenile Code and our holding in *Gleason*, both of which confirm the overarching goals of rehabilitating and treating juvenile offenders.

[¶23]  In citing *Gleason*, we confirm that, despite the apparent disparity in J.R.'s disposition and the statutory limits on misdemeanor sentences for adult offenders, *see* 17-A M.R.S. § 1252(2)(D)-(E) (2017), the goals of rehabilitation and treatment can sometimes "justify longer indeterminate sentences for juveniles."  404 A.2d at 586.  As a result, we discern no inference of gross disproportionality here.  In comparing the gravity of the offense with the sentence's severity, we consider (1) the disposition imposed compared to the statutorily permitted alternatives and (2) the particular facts of J.R.'s case "in conjunction with the commonly accepted goals of punishment." *State v. Lopez*, 2018 ME 59, ¶ 16, --- A.3d --- (quotation marks omitted).

[¶24]  J.R. was adjudged to have committed two counts of criminal mischief (Class D) and three counts of theft (Class E) in four different instances of criminal conduct increasing in seriousness over time.  The length of the institutional disposition ordered by the court was mandated by statute as an indeterminate period not to exceed J.R.'s eighteenth birthday.  *See* 15 M.R.S. § 3316(2)(A) (2017).  Due to J.R.'s age at the time of the disposition, he will spend up to eighteen months incarcerated.

[¶25]  Militating against an inference that J.R.'s sentence is grossly disproportionate is J.R.'s need for substance abuse rehabilitation and his

potential to spend only as much time as it takes to complete the rehabilitation program. All agreed at the dispositional hearing that J.R. needs "real treatment," and all agree on appeal that J.R.'s substance abuse was a significant factor in the court's disposition. Ultimately, as the court impressed upon J.R. after announcing its disposition, the length of J.R.'s time at Long Creek will, in large part, be determined by whether he "do[es] everything [that he is] supposed to do."

[¶26] We need not, and do not, reach the second step of the proportionality analysis because J.R.'s disposition leads to no inference of gross disproportionality. *See Stanislaw*, 2013 ME 43, ¶ 29, 65 A.3d 1242. We note, however, that comparing the length of J.R.'s disposition with that of sentences imposed upon adults, even those convicted of similar crimes, would be inapt.[9] The different purposes of the criminal sentencing statutes and those governing the disposition of juvenile crimes are too great to support an effective comparison. *See Gleason*, 404 A.2d at 580-81, 586.

---

[9] The MCLU suggests that we look to the sentences imposed against adults convicted of similar misdemeanor crimes as a reference point for our proportionality analysis. That analysis would require a mixed application of the very different statutory and constitutional constructs governing adult sentencing and juvenile dispositions, one which cannot withstand scrutiny. As the U.S. Supreme Court has concluded in several contexts, "the constitutional rights of children cannot be equated with those of adults." *Bellotti v. Baird*, 443 U.S. 622, 634-35 (1979); *see also United States v. Rene E.*, 583 F.3d 8, 13-16 & n.8 (1st Cir. 2009). We decline to engage in an analysis here that would, in essence, equate the rights of juvenile and adult offenders with respect to the Eighth Amendment to the United States Constitution and article I, section 9 of the Maine Constitution.

[¶27]  In conclusion, we note the gaps in the continuum of care that are exemplified by J.R.'s case.  In such a case, where the juvenile is unable to engage meaningfully in rehabilitation services in an unsecured setting, Long Creek's secure facility often remains the least restrictive and only choice to undertake the process of substance abuse and correctional treatment for a youth adjudicated of having committed juvenile crimes.  The court is not a provider of social services, and judges' options for the disposition of cases are limited to existing programs and services.  Resources for intervention that have been established by the Legislature, communities, and public and private entities are simply too few and far apart to provide judges with creative alternatives.  By imposing the minimum term permissible for an indeterminate commitment to Long Creek, the court acted within its discretion and did not err in applying the mandates of section 3313 to J.R.'s specific needs.  We, therefore, affirm.

The entry is:

Judgment affirmed.

_____

SAUFLEY, C.J., with whom GORMAN and JABAR, JJ., join, concurring.

[¶28]  I concur completely in the thoughtful and thorough analysis of the Court.  This youth was spiraling out of control, leaving the parties and the court with very few options.

[¶29]  I write separately, however, to address the unfortunate gap in services and placements available to Maine's children and youth who, as with J.R., have found themselves in trouble with the law.

[¶30]  The Legislature has been very clear regarding the purposes of the Maine Juvenile Code.  *See* 15 M.R.S. § 3002(1) (2017).  The parties have spent much time discussing the rehabilitative nature of the Juvenile Code.  Regarding the availability of alternatives for treatment and rehabilitation, the Legislature explicitly provided this guidance:

> **1. Purposes.**  The purposes of this part are:
>
> . . . .
>
> > **D.**  To secure for any juvenile removed from the custody of the juvenile's parents the necessary treatment, care, guidance, and discipline to assist that juvenile in becoming a responsible and productive member of society.

*Id.* § 3002(1)(D).  If we are all to pursue the Legislature's goals in juvenile proceedings, a much greater range of "treatment, care, guidance, and discipline"

22

options must be available to address the individualized needs and challenges of each child and youth.

[¶31] As the Court notes cogently, "In the circumstances presented here, the only meaningful less restrictive alternative to commitment was to place J.R. on probation." Court's Opinion ¶ 16. In this context, where J.R.'s behavior was escalating consistently despite the resources that had been provided, despite parental efforts, and despite the adults' forewarning of potential consequences of his errant behavior, "[t]he trajectory of his behaviors clearly portends future crime." Court's Opinion ¶ 19. In the absence of a resource that was capable of interrupting the escalation of his unacceptable behavior, J.R. would very likely have gone on to commit more serious crimes, possibly harming other members of the public and certainly harming his own potential. Accordingly, the State's position and the court's decision were appropriate and within reason given their alternatives.

[¶32] Nonetheless, the fact that the court was left with two stark alternatives—probation, which would almost certainly fail, or incarceration, which has its own substantial negative repercussions[10]—is a tragedy. While the

---

[10] To be clear, it is the actual incarceration of the youth, with its life-long stigma and emotional ramifications, to which I refer here. I do not intend this reference as a criticism of the staff at Long Creek. In a recent report, the Center for Children's Law & Policy praised the "dedicated professionals at Long Creek who are committed to tackling long-standing problems and improving conditions,

lack of alternatives available today may not be directly contrary to the strictures of Maine law or the Constitutions, we can and must do better for Maine's youth.

[¶33]  The lack of alternatives available to the court, to the youth and his family, and to the attorneys attempting to carry out the Legislature's mandate for rehabilitation of a youth who is out of control, is both shortsighted and fraught with potential long-term consequences.  We, in government, must find additional alternatives for our children and youth.  That continuum of care should include both well-proven and promising innovative programs, including such options as evidence-based behavioral modification programs, residential treatment facilities, enhanced mental health treatment services, and even group homes with structure and oversight, within or near the communities of their families.

---

policies, and practices at the facility."  Center for Children's Law & Policy, *Long Creek Youth Dev. Ctr. Conditions Assessment Narrative Report*, at 4 (September 2017).  At the same time, the report identified several critical shortcomings, including:

> the incarceration of many youth at Long Creek for low-risk offenses, the high rate of referrals of youth to Long Creek from mental health placements, the limited number of community-based mental health services for Maine's adolescent population, questions about the quality and effectiveness of existing community-based mental health services, the high cost of keeping a youth at the facility ($250,000 per year per youth), and the availability of federal funds (e.g., through Medicaid) to support community-based programs but not institutional care.

*Id.* at 73.

24

[¶34]  As we plan for the future of this great State, it is my hope that new and effective alternatives will be available for our children and youth who are in need of individualized services.

---

Tina Heather Nadeau, Esq. (orally), The Law Office of Tina Heather Nadeau, PLLC, Portland, for Appellant J.R.

Maeghan Maloney, District Attorney, and Carie James, Asst. Dist. Atty. (orally), Prosecutorial District IV, Augusta, for appellee State of Maine

Emma E. Bond, Esq., Zachary L. Heiden, Esq., and Meagan S. Sway, Esq., American Civil Liberties Union of Maine Foundation, Portland, for amicus curiae American Civil Liberties Union of Maine Foundation

Skowhegan District Court docket numbers JV-2017-05, JV-2017-21, JV-2017-34
FOR CLERK REFERENCE ONLY