MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2025 ME 70
Docket:      Ken-24-329
Argued:      April 9, 2025
Decided:     August 7, 2025

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

IRINEU B. GONCALVES

HORTON, J.

[¶1]  Irineu B. Goncalves appeals from a sentence imposed by the trial court (Kennebec County, *Murphy, J.*) in a judgment of conviction entered after a jury-waived trial.  The court sentenced Goncalves to thirty years in prison for attempted murder (Class A), 17-A M.R.S. § 152(1)(A) (2025); *see* 17-A M.R.S. § 201(1)(A) (2025), with all but eighteen years suspended and four years of probation.  In the first of his two arguments, Goncalves asserts that the trial court violated his Eighth Amendment rights in arriving at this sentence by failing to consider as a mitigating factor that Goncalves committed the offense while in a "blind jealous rage."  We are not persuaded by this argument, but we agree with Goncalves's other argument—that his attempted-murder sentence

should be vacated because the court erred in finding as an aggravating factor that he had assaulted a hotel clerk.

## I. BACKGROUND

[¶2] Goncalves's appeal is from a judgment of conviction in which the trial court sentenced him for five crimes:

- attempted murder (Class A), 17-A M.R.S. § 152(1)(A); *see id.* § 201(1)(A);

- domestic violence aggravated assault (Class B), 17-A M.R.S. § 208-D(1)(D) (2023);[1] *see* 17-A M.R.S. § 208(1)(C) (2025);

- domestic violence criminal threatening (Class D), 17-A M.R.S. § 209-A(1)(A) (2023);[2] *see* 17-A M.R.S. § 209 (2025);

- assault on an officer (Class C), 17-A M.R.S. § 752-A(1)(A), (3) (2025); and

- violating a condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2025).

The facts relevant to this appeal are drawn from the procedural record and from the court's written findings of fact after the bench trial and its oral findings at sentencing, which are all supported by competent evidence in the record,

---

[1] The relevant paragraph of this statute has been amended since the date of the charged crime to include conduct against "a dating partner as defined in Title 19-A, section 4102, subsection 4" in the definition of the crime. *See* P.L. 2023, ch. 465, § 4 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 208-D(1)(D) (2025)).

[2] The relevant paragraph of this statute has been amended since the date of the charged crime to include conduct against "a dating partner as defined in Title 19-A, section 4102, subsection 4" in the definition of the crime. *See* P.L. 2023, ch. 465, § 7 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 209-A(1)(A) (2025)).

except as we indicate. *See State v. Wilson*, 2015 ME 148, ¶ 13, 127 A.3d 1234; *State v. Commeau*, 2004 ME 78, ¶ 15, 852 A.2d 70.

[¶3] As of June 14, 2023, Goncalves and the victim, the parents of two young children, had been in an on-and-off relationship for approximately five years. Goncalves lived in Massachusetts but worked as a truck driver and arranged his routes so that he could stay in Waterville, where the victim resided, to see her and the children. Despite a breakup in September 2022, Goncalves and the victim continued to have contact, and Goncalves wanted to continue his relationship with the victim.

[¶4] On June 14, 2023, Goncalves called the victim repeatedly on her cell phone and contacted her through a communication software application. The victim played in a pick-up soccer game that evening, and when she saw Goncalves walking alongside the road during her drive home, she agreed to give him a ride to the Waterville hotel where he was staying. She told him that she had to be home by 8:30 p.m. He directed her to pull into the hotel's back parking lot, which she did.

[¶5] While they were still in the car, Goncalves begged the victim to go inside with him and asked why they could not be together and if she was seeing someone else. When she received a text message at 8:04 p.m. from a man with

4

whom she plays soccer, Goncalves became angry and did not believe her assurances that the man was only a friend. Goncalves calmed down and asked for a hug. The victim hugged him, and then Goncalves opened the passenger side door to exit the car. Standing between the door and the body of the car, he refused to close the door despite the victim's insistence that she needed to get home to the children. In an effort to edge away from him, the victim put her car in reverse and removed her foot from the brake. As she then eased the car forward so she could depart, Goncalves jumped back into the car, shut the door, and stared at her. She happened to notice that the dashboard clock read 8:24 p.m.

[¶6] Goncalves said, "I am going to kill you this time, I am going to kill you now." He put his right hand on the victim's throat, pushing her back into the seat, and pressed on her trachea as if to crush it. She coughed up blood. He continued to push her into the seat while bracing himself against her seat with his left hand and the passenger seat with one knee, with one foot on the floor. He pulled his hand back as if to rip her throat out, and the victim was unable to breathe. She tried to press the gas pedal to accelerate the car and throw him off balance, but she could not reach it. When she squeezed his testicles, he used both hands to squeeze her neck.

[¶7] The victim opened the door and was able to breathe long enough to scream for help. She got her left foot out the door and slipped out of the chest strap of her seatbelt but was still held by the lap belt. A van pulled up, and she twisted to get out of the lap belt. She landed on the ground near the car. She screamed, "He is going to kill me!" The van driver yelled at Goncalves to stop and called 9-1-1. Instead of stopping, Goncalves told the van driver that he had a firearm in his backpack and would kill the driver and the victim.

[¶8] Outside the car, Goncalves punched the victim's face, ear, and head. He pinned her down, put his knees on her chest, and began to strangle her while staring into her eyes. She lost sensation in her hands and feet. Her hearing diminished. She felt cold.

[¶9] The hotel's front desk clerk came outside while Goncalves was on top of the victim. She yelled at Goncalves to stop and pulled on the backpack he was wearing to get him off the victim. One of his hands was drawn away from the victim, but due to exhaustion, the clerk had to let go. Goncalves continued to choke the victim with two hands.

[¶10] A police officer arrived and attempted to restrain Goncalves. Goncalves bit him and twisted his ear as if to pull it off. The officer yelled, "Let

go of my gun!" when Goncalves attempted to pull the officer's firearm out of its holster. With his face expressionless, Goncalves continued to fight.

[¶11] The hotel clerk hid behind a vehicle. Another officer arrived and attempted to pepper spray Goncalves twice. The first officer also administered his taser twice. It was not until a third officer arrived, however, that the police were able to subdue and handcuff Goncalves.

[¶12] Eventually the victim started to feel her fingers and toes again and saw paramedics at her side. She suffered injuries to her face, eyes, arms, back, shoulders, and hands. Her nose was broken, and the whites of her eyes were thoroughly bloodshot. She was taken to the hospital and treated for her injuries. The hospital released her to recover at home, and five days later she returned with head pain and dizziness. A doctor determined that she had likely suffered a concussion.

[¶13] Goncalves, meanwhile, was taken into custody. Goncalves asked one of the officers why the officer was looking so serious. After the officer said that he always looked serious, Goncalves said that the officer should smile and not take it personally.

[¶14] On August 24, 2023, the grand jury charged Goncalves by indictment with seven crimes—the five listed above and two other charges:

domestic violence aggravated assault (Class B), 17-A M.R.S. § 208-D(1)(A), and domestic violence terrorizing (Class D), 17-A M.R.S. § 210-B(1)(A) (2023).[3] Those two other charges were later dismissed as part of an agreement by which Goncalves pleaded guilty to domestic violence aggravated assault, 17-A M.R.S. § 208-D(1)(D), and violating a condition of release, 15 M.R.S. § 1092(1)(A).

[¶15]  On May 28 to 30, 2024, the court held a jury-waived trial on the charges of attempted murder, domestic violence criminal threatening, and assault on an officer.  The State offered testimony from the victim, the hotel clerk, the van driver who called 9-1-1, the first two officers to arrive at the scene, an EMT who attended to the victim, the doctor who saw the victim when she returned to the hospital for care, and the victim's sister, who had helped her during her recovery.

[¶16] Goncalves called one witness—a criminal psychologist who opined that, although Goncalves did not have cognitive problems or ongoing mental health issues, the reports about his blank expression and staring during the assault and his own report that he did not recall the time between the victim moving the car and him being restrained by police indicated that he was either

---

[3] The relevant paragraph of this statute has been amended since the date of the charged crime to include conduct against "a dating partner as defined in Title 19-A, section 4102, subsection 4" in the definition of the crime.  *See* P.L. 2023, ch. 465, § 9 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 210-B(1)(A) (2025)).

in a blind rage or experienced a dissociative episode when he was strangling the victim. The psychologist reasoned that Goncalves had felt threatened when the car moved while he was next to it and had a traumatic response—going into fight mode. He characterized the events as flowing from an unspecified dissociative disorder and testified that Goncalves's inability to be consciously aware of what he was doing affected his ability to form intent.

[¶17]  The court entered written findings on June 26, 2024, finding Goncalves guilty of all three charges tried to the court. The court found that although Goncalves suffered from an abnormal condition of mind when he attacked the victim, there was no trauma event that explained the dissociative features of his conduct. The court found that Goncalves reacted to the victim's need to leave to care for their children with extreme and relentless rage and violence. The court found that he "knew who he was attacking when he began choking and beating [the victim]. This was a very personal attack on someone he knew well. And he signaled his intention to her in the moment before the attacks began: 'I am going to kill you this time, I am going to kill you now.'"

[¶18]  With respect to the attempted murder charge, the court found beyond a reasonable doubt that Goncalves was aware of what he was doing and had the conscious object and firm intent to kill the victim, as particularly

indicated by his stated intent just before attacking her. *See* 17-A M.R.S §§ 152(1)(A), 201(1)(A); *cf.* 17-A M.R.S. § 38 (2025) ("Evidence of an abnormal condition of the mind may raise a reasonable doubt as to the existence of a required culpable state of mind."). It found that the State had also proved beyond a reasonable doubt that he had taken a substantial step toward murdering her. *See* 17-A M.R.S. § 152(1)(A).

[¶19] Similarly, with respect to the charge of domestic violence criminal threatening, the court found that Goncalves had the specific intent to kill the victim and intentionally or knowingly placed her in fear of imminent bodily injury by telling her that he was going to kill her. *See* 17-A M.R.S. §§ 209(1), 209-A(1)(A). It found that Goncalves's abnormal condition of mind did not negate his conscious intent to place the victim in fear of imminent bodily injury and that the State had proved beyond a reasonable doubt that Goncalves and the victim were family or household members. *See* 17-A M.R.S. §§ 209(1), 209-A(1)(A); *cf.* 17-A M.R.S. § 38.

[¶20] With respect to the charge of assault on the officer who initially attempted to restrain Goncalves, the court found that when Goncalves bit the officer's hand and tore at his ear, he intentionally caused bodily injury to the officer while the officer was performing his official duties. *See* 17-A M.R.S.

§ 752-A(1)(A).   It further found that any abnormal condition of mind experienced by Goncalves did not negate his intent to cause bodily injury to the officer.  *See* 17-A M.R.S. § 752-A(1)(A); *cf.* 17-A M.R.S. § 38.

[¶21]   After receiving sentencing memoranda from the State and Goncalves, the court held a sentencing hearing on July 10, 2024.

[¶22]  In formulating its sentence for the attempted murder, the court first determined the basic sentence based on the nature and seriousness of the criminal conduct itself.  *See* 17-A M.R.S. § 1602(1)(A) (2025).  The court found that Goncalves's attack on the victim had been in close quarters and was brutal, persistent, and unrelenting.  The court considered the offense to be in the upper tier of the continuum of seriousness and set the basic sentence at twenty-five years.  *See id.*; 17-A M.R.S. § 1604(1)(A) (2025) (establishing a maximum term of imprisonment of thirty years for a Class A crime).

[¶23] At the second step of the sentencing process, the court determined "the maximum term of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case."  17-A M.R.S. § 1602(1)(B).  The court considered as mitigating factors that Goncalves had no criminal record, accepted responsibility by pleading

guilty to several serious charges before trial, and had good relationships in his family and a good work ethic.

[¶24]  With respect to Goncalves's asserted abnormal condition of mind, the court found as follows:

> In this case, the Court found based primarily on the State's witnesses, that the defendant did experience an abnormal condition of mind, not based upon a biologically based mental illness because the defense agrees there is no mental health history here, but it was noteworthy to the professional witnesses as well as the lay witnesses, that it seemed that Mr. Goncalves was impervious to efforts made by a number of people to restrain him, to tase him, to subject him to extreme levels of electronic voltage and he didn't make a sound when these vicious attacks were going on.  So I don't fault at all the defense for raising that issue and attempting to raise reasonable doubt, but as the parties know the Court concluded that this is one of those cases where actually the abnormal condition of mind, as [the expert] I think said pretty clearly, there were two basic theories; one, is that it was a dissociative state, and the other theory is that it was blind rage, blind jealous rage, and frankly, based upon the record and the history of the parties the Court believes that what was going on was blind rage.
>
> And so the Court is not going to mitigate, or find as a mitigating factor the fact that there was an abnormal condition of mind.  Had it been a biologically based mental illness, had it been a developmental disability over which he had some control, the Court might use that as a mitigating factor, but under the circumstances the Court declines to use the abnormal condition of mind as a mitigating factor.

[¶25]  The court declined to use evidence of uncharged conduct by Goncalves against the victim as an aggravating factor because it was not clear

why previous matters involving the two were dismissed. The court considered Goncalves's persistent communications to the victim and his conduct toward the van driver and the hotel clerk as aggravating factors. The court referred to "the assault that he made against" the hotel clerk and stated that Goncalves responded to the intervention of others with "threats to kill [the van driver], and assaultive conduct against [the hotel clerk]." The court also considered the profound impact on the victim with respect to both physical and psychological harm. Because of these aggravating factors, which the court determined outweighed the mitigating factors, the court increased the sentence to thirty years.

[¶26] In the third step of the sentencing analysis, the court determined whether and for what duration to suspend any portion of the maximum term of imprisonment. *See* 17-A M.R.S. § 1602(1)(C). The court suspended all but eighteen years of the maximum term that it had determined for attempted murder and ordered four years of probation. The court then imposed a fully suspended consecutive thirty-month sentence with two more years of probation for assault on an officer, and additional sentences running concurrently with the attempted murder sentence for the other crimes of which Goncalves was convicted.

[¶27]  Goncalves timely appealed from the judgment of conviction.  *See* 15 M.R.S. § 2115 (2025); M.R. App. P. 2B(b)(1).  He also applied for leave to appeal from his sentence, *see* 15 M.R.S. §§ 2151-2157 (2025); M.R. App. P. 20, but the Sentence Review Panel denied that application.  *See State v. Goncalves*, No. SRP-24-331 (Oct. 28, 2024).  Thus, his arguments on appeal—both of which focus on his sentence and not any aspect of the trial or findings of guilt—challenge only the legality of the sentence, not its propriety.  *See State v. Hemminger*, 2022 ME 32, ¶ 14, 276 A.3d 33.

## II.  DISCUSSION

[¶28]  Goncalves argues that the court, in sentencing him for attempted murder, (A) violated his Eighth Amendment rights in refusing to consider his "blind jealous rage" as a mitigating factor[4] and (B) erred in finding as an aggravating factor that he assaulted the hotel clerk.  We consider each argument in turn.

## A.    The Eighth Amendment and "Blind Rage" as a Mitigating Factor

[¶29]  For purposes of our analysis, we assume, without deciding, that the blind rage that the court found to have driven Goncalves's assaultive

---

[4]  Goncalves has not presented an argument under the Maine Constitution's counterpart to the Eighth Amendment.  *See* Me. Const. art I, § 9 ("Sanguinary laws shall not be passed; all penalties and punishments shall be proportioned to the offense; excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted.").

14

behavior can, as the court found in convicting Goncalves, constitute an abnormal condition of mind. We acknowledge that rage can in some circumstances mitigate the seriousness of criminal conduct. For instance, as set forth in the manslaughter statute, "The fact that the person causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation constitutes a mitigating circumstance reducing murder to manslaughter . . . ." 17-A M.R.S. § 203(1)(B) (2025). The manslaughter statute plainly has no application here because Goncalves's murderous conduct was unprovoked, but the phrase "under the influence of extreme anger" is an apt descriptor of "blind rage." The question before us is whether the Eighth Amendment compelled the court to consider Goncalves's blind rage as a mitigating factor in determining its sentence for attempted murder.

[¶30] Goncalves argues that the court erred in determining that because the condition was not biologically based, his "blind rage" was categorically excluded as a mitigating factor for sentencing. He argues that the court was required to consider his blind rage as an abnormal condition of mind in mitigation despite its ruling that his mental state did not negate—i.e., raise a reasonable doubt as to—his criminal intent. He concludes that his sentence violates the Eighth Amendment of the United States Constitution, which

requires that the punishment be appropriate in the circumstances of the individual case.

[¶31] The State responds that Goncalves has misconstrued the court's sentencing analysis and argues that the court fully considered Goncalves's abnormal condition of mind but was not persuaded that it was mitigating.

### 1.     Standard of Review

[¶32] When preserved, an argument under the Eighth Amendment presents a legal issue that we review de novo. *See City of Lewiston v. Verrinder*, 2022 ME 29, ¶ 15, 275 A.3d 327. When a party fails to raise the issue to the trial court, however, it is unpreserved and will be reviewed only for obvious error. *See State v. Watson*, 2024 ME 24, ¶ 18, 319 A.3d 430; *State v. J.R.*, 2018 ME 117, ¶ 20, 191 A.3d 1157.

[¶33] At sentencing, Goncalves did not mention the Eighth Amendment, arguing only, "We respect the Court's findings after trial. However, that doesn't mean the Court still cannot consider an expert's opinion when determining sentence, Your Honor." He argued that the sentence should be lower because he dissociated and acted in a way that was out of character for him. Because Goncalves never argued or even mentioned the Eighth Amendment in the trial court, we conclude that the basis for his argument was not preserved. We

therefore apply the obvious error standard of review. "Error is obvious when there is (1) an error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, we must also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings before we vacate a judgment on the basis of the error." *Watson*, 2024 ME 24, ¶ 18, 319 A.3d 430 (quotation marks omitted).

**2.    Eighth Amendment Analysis**

[¶34]  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Eighth Amendment does not mention disproportionate punishments explicitly, but rather incorporates the principle that a grossly disproportionate punishment is cruel and unusual." *State v. Ward*, 2011 ME 74, ¶ 16, 21 A.3d 1033 (citing *Graham v. Florida,* 560 U.S. 48, 59 (2010) ("For the most part . . . punishments [are] challenged not as inherently barbaric but as disproportionate to the crime. The concept of proportionality is central to the Eighth Amendment.")).

[¶35]  In capital cases, the Supreme Court has indicated that a sentencing court must consider any mitigating factor that might weigh against the imposition of the death penalty. *See Eddings v. Oklahoma*, 455 U.S. 104, 113-15

(1982); *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (footnote omitted)).[5]  The Court has also interpreted the Eighth Amendment's proportionality principle to apply to life sentences without the opportunity for parole.  *See Graham*, 560 U.S. at 59 (providing that as to such sentences, "the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive").

[¶36]  The Court reviewed a death penalty sentence in which the sentencing court found that the defendant had a difficult childhood and a personality disorder but concluded—as did the intermediate appellate court— that these were not properly considered as mitigating factors because they would not excuse the defendant's behavior.  *Eddings*, 455 U.S. at 108-10.  The Supreme Court held, "Just as the State may not by statute preclude the

---

[5]  The Court further explained, "[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.  When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."  *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence [the defendant] proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 113-15; *see also Payne v. Tennessee*, 501 U.S. 808, 822 (1991) (reaffirming that in a death penalty case, "a State cannot preclude the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death" (quotation marks omitted)).

[¶37] Applying this standard, the Court has held that evidence of developmental and cognitive deficits must be considered as mitigating factors in a death penalty case, whether or not such a characteristic of the offender affected the commission of the crime, because impairments in intellectual function are "inherently mitigating." *Tennard v. Dretke*, 542 U.S. 274, 285-87 (2004). It has also held that, for juveniles, a mandatory sentence of life without the possibility of parole violates the Eighth Amendment's proportionality requirement, even for a homicide conviction, because the statutory mandate

precludes the sentencing court from considering mitigating factors such as youth and any cognitive or developmental issues before imposing a sentence that is, for a juvenile, similar in gravity to the death penalty. *Miller v. Alabama*, 567 U.S. 460, 469-80 (2012); *see also Graham*, 560 U.S. at 82 (reaching this conclusion earlier as to a non-homicide juvenile case).

[¶38] Outside the realm of capital cases and life sentences without parole, however, the Court has indicated that "legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury." *Lockett*, 438 U.S. at 603 (quotation marks omitted); *see also id.* at 604-05 (noting that for noncapital sentences, "the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes").

[¶39] Goncalves contends that even in a noncapital case, a court must, to comply with the Eighth Amendment, consider a defendant's blind rage as an abnormal condition of mind in mitigation, regardless of whether the condition has an organic or biological basis or constitutes a developmental or cognitive disability, and regardless of whether it negates an element of the crime for which the defendant is being sentenced. However, we do not view the Eighth Amendment to require the court to consider an adult defendant's blind rage to

be a mitigating factor for purposes of sentencing in a noncapital case, particularly when the blind rage is unprovoked, *cf.* 17-A M.R.S. § 203(1)(B). *See Lockett*, 438 U.S. at 603-605.[6] As we held in *State v. Dobbins*, 2019 ME 116, ¶ 57, 215 A.3d 769, where an adult defendant argued that his youth had to be considered as a mitigating factor, "The opinions in *Graham* and *Miller* are built on two factors that are not present here: offenders who are younger than eighteen at the time of the crime, and the imposition of a life sentence (discretionary in *Graham*, mandatory in *Miller*) without any possibility of parole."[7] *See Graham*, 560 U.S. at 59-60 (citing cases that demonstrate that "it has been difficult for the challenger to establish a lack of proportionality" in noncapital sentences).

[¶40] We need not decide whether the Eighth Amendment ever requires the consideration of an abnormal condition of mind as a mitigating factor when a court sentences an adult to a term of years. It is sufficient for us to conclude that even if we were to apply the reasoning that the Supreme Court has applied to death-penalty and juvenile life sentences, Goncalves would not prevail. At

---

[6] Goncalves has raised no argument that the Maine Constitution or any Maine statute requires the consideration of "blind rage" or "blind jealous rage" as a mitigating factor when a court sentences a defendant for a Class A crime.

[7] *See also State v. J.R.*, 2018 ME 117, ¶ 21, 191 A.3d 1157 ("[C]ourts rarely find sentences disproportionate pursuant to the Eighth Amendment of the United States Constitution, except in cases involving the death penalty or juvenile defendants." (quotation marks omitted)).

sentencing, the court made it clear that, as between a dissociative state and "blind rage," it was the latter that defined Goncalves's mental state during his criminal acts. Assuming that his blind rage constituted an abnormal condition of mind, it was a transient phenomenon and not the kind of permanent condition—such as cognitive, intellectual or developmental impairment or disability—that the Supreme Court has held is inherently mitigating, at least in capital cases. *See Tennard*, 542 U.S. at 287.

[¶41] Moreover, regardless of whether an incident of domestic violence results in part or whole from the batterer's blind rage, there is nothing in the sentencing statutes that requires the court to consider blind rage in mitigation. In fact, courts are required by statute to consider whether to order such defendants to address their behavior through certified domestic violence intervention programs. *See* 17-A M.R.S. § 1807(2)(D-1), (5) (2025). Because it is primarily the sentencing statutes, rather than the Eighth Amendment, that govern sentencing in Goncalves's case, *see Lockett*, 438 U.S. at 603-05, we discern no error, much less obvious error, in the court's determination that Goncalves's blind jealous rage was not a mitigating factor for sentencing purposes.

**B.      Finding of Assault of the Hotel Clerk as an Aggravating Factor**

[¶42]  The parties agree that the court inaccurately based its sentence for attempted murder in part on "'the assault [Goncalves] made against'" the hotel clerk, when there was no evidence that he assaulted the clerk.  They disagree about whether a remand is necessary for the court to reconsider the sentence without that aggravating factor.

**1.      Standard of Review**

[¶43]  When preserved, we review a sentencing court's factual findings for clear error to determine whether competent evidence in the record supports the finding.  *See State v. Prewara*, 687 A.2d 951, 954-55 (Me. 1996); *see also State v. Rosario*, 2022 ME 46, ¶¶ 39-40, 280 A.3d 199 (reviewing the sufficiency of the evidence to support a sentencing fact when reviewing the legality—not the propriety—of the sentence).  Because Goncalves did not draw the trial court's attention to its erroneous finding that he assaulted the hotel clerk, however, *see* M.R.U. Crim. P. 35(a) (authorizing a motion for correction of a sentence), we review this issue for obvious error.  *See Watson*, 2024 ME 24, ¶ 18, 319 A.3d 430.  "Error is obvious when there is (1) an error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, we must also conclude that (4) the error seriously affects the fairness and integrity

or public reputation of judicial proceedings before we vacate a judgment on the basis of the error." *Id.* (quotation marks omitted).

### 2. Obvious Error Analysis

[¶44] The State concedes that there is an error that is plain on the record; there is no evidence to support the court's finding that Goncalves assaulted the clerk. *See* 17-A M.R.S. § 207(1)(A) (2025).[8] We must therefore consider whether the error affects Goncalves's substantial rights, namely his due process right arising from his liberty interest in a sentence in which each aggravating factor has a basis in fact and law. *See Green v. State*, 247 A.2d 117, 121 (Me. 1968) ("[A] sentence substantially predicated upon assumptions concerning past criminal activity untrue in fact or upon misinformation as to other material facts, either as a result of carelessness or design, would be in violation of due process."); *Watson*, 2024 ME 24, ¶ 34, 319 A.3d 430 (vacating a sentence and remanding for resentencing due to obvious error given "the importance of the liberty interest at stake . . . and the need to ensure that due consideration is given to all relevant and proper sentencing factors—and no improper factors—when determining a sentence").

---

[8] As the statute would apply in the circumstances here, where both Goncalves and the clerk are adults, an assault occurs when a "person intentionally, knowingly or recklessly causes bodily injury or offensive physical contact to another person." 17-A M.R.S. § 207(1)(A) (2025).

[¶45]  When a defendant challenges the validity of information that a court considers in its sentencing analysis, "[t]he reviewing court must examine the record to see whether the sentencing judge gave specific consideration to the questionable information." *United States ex rel. Welch v. Lane*, 738 F.2d 863, 866 (7th Cir. 1984).  Thus, a sentence will be vacated if the record shows that the court's reliance on consequential misinformation "is explicit and incontrovertible." *Id.*; *State v. Alexander*, 858 N.W.2d 662, 671-72 (Wis. 2015) (analyzing whether the court, in its articulation of the basis for the sentence, explicitly relied on an improper factor); *see also United States v. Tucker*, 404 U.S. 443, 447-49 (1972) (concluding, on habeas corpus review, that resentencing was necessary because the sentencing court had explicitly relied on unconstitutional prior convictions in sentencing the defendant); *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948) (concluding, on habeas corpus review, that a state supreme court erred in denying habeas relief to a defendant who was sentenced based on inaccurate information at a time when he lacked representation).

[¶46]  To determine whether a sentencing error affects substantial rights, we consider whether there is "a reasonable probability that, but for the error, the [sentencing] court would have imposed a different, more favorable

sentence." *United States v. González-Castillo*, 562 F.3d 80, 83 (1st Cir. 2009) (quotation marks omitted); *see also State v. Pabon*, 2011 ME 100, ¶¶ 25-29, 28 A.3d 1147 (emphasizing, in following federal caselaw, that the principles that underlie the federal plain-error rule also underlie Maine's obvious-error rule). A defendant's rights are substantially affected when a sentencing court assumes an unsupported fact of significance in the sentencing. *See González-Castillo*, 562 F.3d at 83; *see also State v. Moore*, 2023 ME 18, ¶ 25, 290 A.3d 533 (citing *Commonwealth v. Bethea*, 379 A.2d 102, 106 (Pa. 1977) (stating that "a sentence based in part on an impermissible consideration is not made proper simply because the sentencing judge considers other permissible factors as well")); *United States v. Avilés-Santiago*, 558 F. App'x 7, 10 (1st Cir. 2014) ("[A] sentence based on an unsupported fact cannot stand."). We have made clear that the consideration of improper information at sentencing undermines due process. *See Green*, 247 A.2d at 121.

[¶47]  In several cases, federal courts have vacated sentences when there was a reasonable probability that the court's unsupported findings resulted in a more severe sentence. *See, e.g.*, *González-Castillo*, 562 F.3d at 83 (concluding that an unsupported finding that the defendant was convicted of a similar crime affected the defendant's substantial rights when the finding motivated the court

to focus on deterrence); *United States v. Wilson*, 614 F.3d 219, 224-25 (6th Cir. 2010) (concluding that an unsupported finding that played an important role in sentencing affected the defendant's substantial rights); *United States v. Corona-Gonzalez*, 628 F.3d 336, 341-43 (7th Cir. 2010) (holding, based on a review of the sentencing transcript, that there was a "substantial chance" that the misapprehension of a fact resulted in a more severe sentence).

[¶48] In contrast, when courts have held that there was no reasonable probability of a different sentence, they have done so because in the context of the sentencing, the fact was not of consequence. *See, e.g.*, *Putt v. United States*, 363 F.2d 369, 370 (5th Cir. 1966) (affirming a sentence when false information in a report submitted to the court had no demonstrated effect on the sentence); *United States v. Turbides-Leonardo*, 468 F.3d 34, 38-40 (1st Cir. 2006) (holding that a defendant who acquiesced in the characterization of his earlier conviction as a drug trafficking offense failed to demonstrate a reasonable probability of a more lenient sentence when he did not demonstrate that his criminal record, if produced, would "show that his prior offense was other than a drug trafficking offense" and result in a lesser sentence); *United States v. Martin*, 739 F. App'x 851, 853-54 (7th Cir. 2018) (affirming a sentence upon concluding that the court's unsupported findings—including an inaccurate

finding that the defendant was convicted for criminal conduct when he had in fact only admitted to the conduct—were inconsequential to the sentence); *Lechner v. Frank*, 341 F.3d 635, 639-40 (7th Cir. 2003) (concluding, on a habeas appeal, that resentencing was not necessary when there was "no indication in the record that the [sentencing] court founded its sentence at least in part on" the unsupported facts).

[¶49] The materiality of the error to the court's sentencing analysis is the decisive consideration. Thus, if a court finds that an extended pattern of uncharged conduct constitutes an aggravating factor, and a single instance among many is unsubstantiated, the error may reasonably be deemed inconsequential. Similarly, if a court finds a defendant's substantial criminal history to be an aggravating factor, a lack of support in the record for one minor misdemeanor conviction among a multitude of convictions for more serious crimes probably would not affect the sentence. This is not such a case. The finding that Goncalves had assaulted the hotel clerk was one of just a few aggravating factors identified in the court's analysis, and the court presumably would not have made an unqualified finding that it was an aggravating factor if the court did not intend it to affect the sentence. We conclude that there is a

reasonable probability that the error affected the sentence and thus affected Goncalves's substantial rights.

[¶50]  The question then becomes whether the error "seriously affects the fairness and integrity or public reputation of judicial proceedings." *Watson*, 2024 ME 24, ¶ 18, 319 A.3d 430 (quotation marks omitted).  Many errors in judicial proceedings do not rise to the level of meeting that standard.  However, the same factors that lead us to conclude that the error in this case was material and probably affected the sentence lead us to conclude that ignoring the error could undermine public confidence in the fairness and integrity of the sentencing process.  *See Avilés-Santiago*, 558 F. App'x at 10; *cf. United States v. Almonte-Nuñez,* 771 F.3d 84, 92 (1st Cir. 2014) ("[L]eaving intact a sentence that exceeds a congressionally mandated limit may sully the public's perception of the fairness of the proceeding.  That perception, in turn, may threaten respect for the courts and may impair their reputation.").

[¶51]  In these circumstances, we vacate the court's judgment sentencing Goncalves on the attempted murder charge and remand for resentencing. *See Watson*, 2024 ME 24, ¶¶ 18, 34, 319 A.3d 430.

The entry is:

> Judgment vacated as to Count 1 (attempted murder).  Remanded for resentencing.

_____

Jamesa J. Drake, Esq. (orally), Drake Law, LLC, Auburn, for appellant Irineu B. Goncalves

Maeghan Maloney, District Attorney, and Shannon Flaherty, Asst. Dist. Atty. (orally), Prosecutorial District IV, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2023-1010
<small>FOR CLERK REFERENCE ONLY</small>